# SAVAGE ARMS CORPORATION *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 13.   Argued October 6, 1924.—Decided November 17, 1924.

Claimant, having been requested to suspend operations as to a large number of articles it was manufacturing under contract with the Government, sought to confine the suspension to a smaller number, promising if this were done, to abandon and settle all claims and disputes growing out of the contract; and, when the suspension request was revised accordingly, accepted it, but with an attempted reservation of its right to perform the contract and especially its right to recover all the profits it would have made " if it had been permitted to complete the contract." *Held,* that, upon acceptance by the Government of the claimant's proposal, the contract was rescinded as proposed, the release by one party being sufficient consideration for relase by the other; and that the attempted reservation of a right to recover anticipated profits on the articles so eliminated came too late. P. 220.

57 Ct. Clms. 71, affirmed.

APPEAL from a judgment of the Court of Claims rejecting a claim for anticipated profits under a contract to supply magazines for machine guns to the United States, which was in part suspended.

*Mr. Jesse C. Adkins,* with whom *Mr. John H. Iselin* and *Mr. Frank F. Nesbit* were on the brief, for appellant.

*Mr. Blackburn Esterline,* Assistant to the Solicitor General, with whom *Mr. Solicitor General Beck* was on the brief, for the United States.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

On April 30, 1918, appellant entered into a contract with the United States by which, among other things, it agreed to make and deliver 440,000 magazines for Lewis machine

19458°—25——18

guns, for which the United States agreed to pay $4.24 each. After 24,347 of the magazines had been delivered, the Chief of Ordnance requested appellant in the public interest immediately to suspend operations under the contract to the extent of 298,000 magazines. Written notice containing this request was sent to the Rochester District Claims Board for delivery to appellant, to whom its purport was communicated by the Board. Thereupon, appellant entered into verbal negotiations with an official of the Board with the result that an understanding was arrived at between them to the effect that the requested suspension should operate to the extent of 142,000 magazines instead of 298,000 as stated in the notice. The negotiations were exclusively with the Claims Board. No reply was made by appellant to the Chief of Ordnance and it does not appear that the Ordnance Office was informed of the arrangement until long afterwards. Appellant, following this arrangement, continued to deliver magazines until May, 1919, at which time there had been delivered 298,000, leaving undelivered 142,000, under the terms of the original contract. Appellant thereafter neither requested to be allowed to furnish nor attempted to furnish this remaining number.

In addition to the contract for the magazines, appellant had a large number of other contracts with the government for furnishing various sorts of munitions and supplies and had numerous accounts relating thereto. It was, therefore, anxious to close this contract on its books, and, especially so, because there was some discussion going on among the Ordnance officials in respect of the suspension request and a possibility that the change agreed upon between the Board (which was without authority) and the appellant might be challenged, and the magazines in excess of 142,000 charged against appellant as having been improvidently accepted and paid for. Appellant, accordingly, wrote to the Secretary of the Claims Board,

asking him to immediately arrange with the proper officer at Washington for a revised suspension request to terminate the contract in respect of the 142,000 undelivered magazines only, and expressly promising that, upon receipt of such request, appellant would " immediately accept it without making claim for any portion of the 142,-000 magazines so suspended."

Appellant thereafter persistently and repeatedly urged that the officials of the Ordnance Office revise the suspension request by an order authorizing the delivery of the 298,000 magazines. Finally, on August 20, 1919, appellant again wrote, and, after referring to the fact that 142,000 magazines remained undelivered under the contract, said:

" As we have received and accepted no suspension request for this number, it will be appreciated if you will have forthcoming suspension request for our acceptance in termination of this contract.

" Some time ago we received verbal instruction of the Rochester district office to discontinue the manufacture of these magazines, as they were not wanted. So that there will be no misunderstanding, we are anxious to receive and accept suspension request, otherwise the contract will remain open on our books."

Following this letter, a verbal understanding was reached between appellant and an officer representing the government by which appellant agreed to abandon and settle all claims, controversies and disputed points growing out of contract 48–A if the officer would secure a revision of the suspension request so as to allow the delivery of 298,000 magazines instead of 142,000. Thereupon, a new suspension request was issued by direction of the Chief of Ordnance, in consummation of this last agreement. Subsequently, appellant acknowledged receipt of the revised request, saying that it had suspended work in accordance therewith, " reserving, however, all its rights

against the United States Government.    .  .  .   for
failure  .  .  .  to perform all the provisions of the
contract known as No. C.M.G. 48–A and especially its
right to recover all the profits which it would have made
had it been permitted to complete said contract."

Thereafter, appellant several times inquired of the Chief
of Ordnance as to the intention of the government respect-
ing the delivery of the remaining 142,000 magazines or the
payment of prospective profits on account of its refusal
to receive them, to which that officer replied that the
government would not accept delivery and that he was
not authorized to pay anticipated profits.  Thereupon,
appellant brought this suit to recover its anticipated
profits.

The Court of Claims rendered judgment in favor of the
United States and dismissed the petition.

The bare recital of the facts practically disposes of the
case.  From them, it appears that appellant not only
acceded to the elimination of 142,000 magazines from
the obligations of the contract but made persistent and
repeated efforts to secure from the Ordnance Office a
change in the original notice so as to include that num-
ber instead of 298,000, expressly agreeing that if this were
done it would abandon and settle all claims, controversies
and disputed points growing out of the contract.  The
government, through its authorized officials, accepted this
proposal and the arrangement became fixed and binding.
A good deal is said by appellant to the effect that this
agreement was without consideration; but we need not
stop to review the contention.  It is enough to say that
the parties to a contract may release themselves, in whole
or in part, from its obligations so far as they remain ex-
ecutory, by mutual agreement without fresh consideration.
The release of one is sufficient consideration for the release
of the other.  If authority for a rule so elementary be
required, see, for example: *Hanson & Parker* v. *Witten-*

*berg,* 205 Mass. 319, 326; *Collyer & Co.* v. *Moulton,* 9
R. I. 90, 92; *McCreery* v. *Day,* 119 N. Y. 1, 7; *Dreifus,*
*Block & Co.* v. *Salvage Co.,* 194 Pa. St. 475, 486.

It is true that, after receiving the revised notice, appel-
lant assumed to reserve its right " to recover all the profits
which it would have made had it been permitted to com-
plete said contract." The recission of the contract in so
far as it was executory,—that is, in respect of the
142,000 magazines—however, had been consummated by
the government's acceptance of appellant's proposal. The
attempted reservation came too late. Either it was a
mere afterthought or there was a concealment of purpose,
on the part of appellant during the negotiations, amount-
ing to bad faith. Whether the agreement was made re-
luctantly, or appellant got the worst of the bargain, are
matters unnecessary to be considered. It is enough that,
without fraud or coercion, it did agree.

*Affirmed.*