**STEARNS et al. v. CENTRAL PETROLEUM CO.**

No. 1531.

Circuit Court of Appeals, Tenth Circuit.

Dec. 20, 1937.

Charles G. Yankey, of Wichita, Kan. (Harvey C. Osborne, John G. Sears, Jr., Verne M. Laing, and G. K. Purves, Jr., all of Wichita, Kan., on the brief), for appellants.

Arnold C. Todd, of Wichita, Kan. (Ralph Gore and Kurt Riesen, both of Wichita, Kan., on the brief), for appellee.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

G. A. Stearns, Nettie M. Stearns, R. A. Streeter, Jessica I. Streeter, and Loretta F. Koester, doing business under the firm name and style of Stearns-Streeter Company, brought this suit against the Central Petroleum Company for specific performance of an alleged oral agreement of joint adventure, and to establish their rights in certain real property.

On April 14, 1922, Louis J. Ginther and Mary I. Ginther executed and delivered to J. E. Missimer an oil and gas lease on the West Half of the Southeast Quarter, the North Half of the Southwest Quarter, and the Northeast Quarter of Section 19, Township 12 South, Range 15 West, Russell County, Kansas. The Central Company, I. Nadle and Simon Lebow had acquired an assignment of such lease as to the West Half of the Southeast Quarter and the Northeast Quarter of Section 19. There was one producing well on the lease located in the Northeast Quarter of the Northeast Quarter of the Northeast Quarter of Section 19. On April 24, 1934, George G. Ginther, the then owner of the land covered by that portion of the lease assigned to the Central Company, Nadle and Lebow, demanded cancellation of the lease, except as to the 10 acres in the Northeast corner of Section 19, for breach of covenant to develop.

On May 1, 1934, the Central Company, Nadle and Lebow entered into an agreement with George G. Ginther whereby the lessees agreed to commence an oil well either on the West Half of the Southeast Quarter of Section 19 or on the undeveloped portion of the Northeast Quarter of Section 19, before November 1, 1934, and to diligently prosecute the drilling thereof to completion, and Ginther agreed to delay his demand for cancellation until November 1, 1934, and so long thereafter as the lessees continued in good faith to drill and develop the lease.

Elizabeth C. Deckert and William B. Deckert, her husband, George G. Ginther

and Ethel D. Ginther, his wife, George J. Ruff and Ida M. Ruff, his wife, and Louis J. Ginther, a widower, were the owners of an undivided one-half interest in the mineral rights in the Northwest Quarter of Section 30, Township 12 South, Range 15 West, Russell County, Kansas. On April 2, 1934, they executed and delivered to Clark C. Nye, two oil and gas leases, one covering the South Half and the other the North Half of the Northwest Quarter of Section 30.

A group or syndicate known as the "Lucky Seven" had been formed, consisting of Stearns-Streeter Company, J. E. Missimer, C. W. Shaffer, A. E. Seeley, F. S. Liggett, Charles E. Hall, and J. H. Liggett. Each member of the group, except Missimer, owned an undivided 1/14th interest in the mineral rights in the Northwest Quarter of Section 30. Missimer had sold an undivided 1/28th interest to Thomas H. Allan and had retained an undivided 1/28th interest. Hall and J. H. Liggett were deceased and their interests had passed to their heirs.

The leases to Nye provided that the lessee should commence the drilling of a test well on the Northwest Quarter of Section 30 within ninety days after the other owners of mineral rights had either ratified the two leases of April 2, 1934, or executed a lease or leases to him covering their mineral rights.

Allan and all of the members of the Lucky Seven group, except Stearns-Streeter Company and the Liggett heirs, executed ratifications of the leases to Nye, and delivered them in escrow to be delivered to Nye in the event he commenced the drilling of a test well on the Northwest Quarter of Section 30 within six months from April 3, 1934.

On October 6, 1934, Nye agreed to transfer his leases on the Northwest Quarter of Section 30 to the Central Company in consideration of a 1/32nd overriding royalty.

Missimer still retained the Ginther lease of April 14, 1922, as to the North Half of the Southwest Quarter of Section 19. Charles Rusch was the owner of an undivided one-half interest in the mineral rights in the South Half of the Southwest Quarter of Section 19; and the other half of the mineral rights therein was owned by the Lucky Seven group. On August 13, 1934, Charles Rusch and Inez Rusch, his wife, executed an oil and gas lease to Missimer covering their one-half interest in the mineral rights in the South Half of the Southwest Quarter of Section 19.

Prior to October 16, 1934, Missimer had agreed to transfer his leases to the Central Company in consideration of a 1/32nd overriding royalty, and an agreement to drill a well on or offsetting the Southwest Quarter of Section 19. The Lucky Seven group had not ratified the lease to Missimer on the South Half of the Southwest Quarter of Section 19.

The Central Company had also made arrangements to secure an oil and gas lease on the Northeast Quarter of Section 30, Township 12 South, Range 15 West.

The East Half of the Southeast Quarter of Section 19 had not been leased for oil and gas. The mineral rights therein were owned one-half by the Ginther family, and one-half by the Lucky Seven group.

The extension agreement of May 1, 1934, was modified so as to permit the well to be drilled either on or offsetting the Southwest Quarter of Section 19.

On October 16, 1934, Nathan Appleman, secretary of the Central Company, and G. A. Stearns, a member of the Stearns-Streeter Company, met at Gorham, Kansas, pursuant to previous arrangement. At such meeting negotiations were carried on between Appleman and Stearns in behalf of their respective companies. Respecting these negotiations Stearns testified that Appleman wanted him to ratify the leases on the Northwest Quarter of Section 30 and the Southwest Quarter of Section 19, and other lands; that he told Appleman he would not ratify the leases unless he got the drilling on the Northwest Quarter of Section 30 and the other tracts in which the Lucky Seven group owned mineral rights; that Appleman proposed that Stearns-Streeter Company drill the test well in Section 30 and take a one-eighth interest in the lease in part payment therefor; that they figured the cost of drilling the well to a depth of 3000 feet at $2.75 per foot, or $8,250.00, and the cost of the derrick, pipe, electric energy, water, pond, and under-reamer, at $8,850.00, an aggregate cost of $17,100.00; that Appleman proposed that Stearns-Streeter Company drill the well for a one-eighth interest and $5,750.00; that he made a counter-proposal to Appleman of $6,000.00; that after further negotiations it was proposed that Stearns-Streeter Company furnish the 15-1/2 inch and 12-1/2 inch casing and a sand reel, and

that the Central Company furnish the tubing, rods, and tanks in the field; that Appleman requested Stearns to help get the ratifications of the Lucky Seven group and other owners of the leases; that Stearns agreed to do so; that Appleman then said, "We have made a deal"; that Appleman also agreed that Stearns was to have one-half of the additional drilling on the other tracts in which the Lucky Seven group was interested, but that no specific terms for such additional drilling were agreed upon.

Stearns produced a memorandum book in which during the negotiations at Gorham he had written down in general language the substance of the alleged agreement and in which Appleman had written down the items of cost for drilling and equipping the well.

Stearns further testified that pursuant to agreement he and Appleman met in Russell, Kansas, the following day; that they went to a hotel room of Mr. Davis, land man for Stearns-Streeter Company; that he told Davis he had made a deal with Appleman and that Appleman would dictate notes to Davis from which a contract could be drawn; that Appleman then dictated the notes to Davis; that Davis completed the drafting of the contract, but that it was never presented to Appleman for execution due to the latter's absence in Florida; that Stearns assisted Appleman in securing leases from owners of mineral interests.

The testimony of Davis corroborated Stearns as to what took place at Russell, and with respect to the securing of the ratifications and leases from owners of mineral interests.

Cliff R. Holland, an attorney at law at Russell, Kansas, testified that on October 17, 1934, he went to the room of Mr. Davis at the Driscoll Hotel in Russell; that Davis, Stearns and Appleman were present when he arrived; that he told Appleman he had called Clark Nye over the telephone and requested him to come to Russell to secure the ratifications of Stearns-Streeter Company to the Nye leases on the Northwest Quarter of Section 30; that Nye had stated it was impossible for him to come, and suggested that Appleman secure the signatures of Stearns-Streeter Company; that Stearns then stated that he would not under any conditions ratify the Nye leases, and Appleman then said if Stearns would not ratify the Nye leases they could not proceed with the deal; that Stearns

then said, "So far as I am concerned, the deal is off"; that Appleman then said it was agreeable to him to consider the deal off, and thereupon he and Appleman left the room.

Stearns also stated he would not ratify the Missimer lease on the North Half of the Southwest Quarter of Section 19, if Missimer was to receive a 1/32nd overriding royalty.

Stearns knew of the existence of the Nye leases on the Northwest Quarter of Section 30 when he entered the negotiations with Appleman at Gorham, and had theretofore refused to ratify such leases, and he reiterated this refusal during the negotiations at Russell. He also knew that Appleman was obligated to commence the drilling of a well on the Northwest Quarter of Section 30 on or before November 1, 1934. He also understood and wrote down in the memorandum book that all of the leases were to carry a 1/32nd overriding royalty.

Appleman testified that he met Stearns at Gorham, Kansas. His testimony does not differ substantially from that of Stearns', except Appleman testified that the negotiations were not completed, and that they agreed to meet the following day at Russell to close the contract. He testified to the same facts as Holland with respect to the refusal of Stearns to ratify the Nye leases and the mutual agreement to abandon the effort to consummate the contract with Stearns-Streeter Company to drill the well.

Appleman further testified that following the meeting at Davis's room he met Deckert and George G. Ginther at Holland's office in the afternoon of the same day for the purpose of telling them that his project to drill a well was off; that while he was talking to Deckert and Ginther, Seeley and Stearns came to see him and asked him if he was still interested in drilling a well in the area under consideration; that he advised them he was on certain conditions; that he was willing to pay a 1/32nd overriding royalty; that he was already obligated to Nye and Missimer to pay them that amount of royalty for a transfer of their leases; that as a result of this conversation the parties undertook a new plan to secure the leases for the Central Company.

Holland corroborated Appleman's testimony with respect to the new plan to secure the leases. Without going into detail

it is sufficient to say that the leases were finally secured by the Central Company.

The fact that the original plan was abandoned is corroborated by a letter written by Holland to Nye on October 18, 1934, in which Holland stated that the negotiations had broken down and that the Central Company could not proceed with the deal as contemplated.

Thereafter, the Central Company entered into a contract with one Gore to drill an oil and gas well on the Northwest Quarter of Section 30. The well was spudded in on January 8, 1935. Stearns did not learn that the Central Company had entered into the contract with Gore until a few days prior to March 4, 1935. On that date Stearns wrote a letter to Appleman demanding performance of the alleged oral agreement.

On June 12, 1935, Stearns-Streeter Company commenced this suit.

The trial court found that the negotiations between Stearns and Appleman at Gorham were not completed; that the negotiations were continued at Russell, and that while they were in progress Stearns stated he would not ratify the Nye leases and refused to proceed further with the negotiations. He concluded as a matter of law that Stearns-Streeter Company failed to establish the alleged oral agreement.

From a decree for the Central Company, Stearns-Streeter Company has appealed. Where a chancellor has considered conflicting evidence and has made his findings and decree thereon, they must be regarded as presumptively correct, and unless a serious mistake has been made in the consideration of the evidence, or an obvious error has intervened in the application of the law, the decree should be permitted to stand.[1]

The trial court had the opportunity to observe the witnesses and to judge of their credibility. His findings are supported by substantial evidence. The facts as testified to by Appleman and Holland are supported by the surrounding facts and circumstances. Appleman had arranged to acquire the leases from Nye and Missimer, and Stearns was unwilling to ratify them if Nye and Missimer were to receive a 1/32nd overriding royalty. In that situation it was impracticable for Appleman to consummate the contract for the drilling of the test well. The fact that the written contract was never presented to Appleman also tends to indicate the negotiations were abandoned.

We are of the opinion that under the evidence the trial court was justified in finding that the negotiations were terminated by mutual consent, and that if a tentative oral agreement had been arrived at, the parties mutually agreed it should be discharged.

The parties to an executory contract may rescind it by mutual consent.[2]

The decree is accordingly affirmed.

---

[1] Whitchurch v. Crawford, 10 Cir., 92 F.2d 249, 254; Standard Oil Co. of Colorado v. Standard Oil Company, 10 Cir., 72 F.2d 524, 527; Clarke v. Hot Springs Electric Light & Power Co., 10 Cir., 55 F.2d 612, 615; Independent Oil Well Cementing Co. v. Halliburton, 10 Cir., 54 F.2d 900, 908.

[2] Savage, Arms Corporation v. United States, 266 U.S. 217, 220, 45 S.Ct. 30, 69 L.Ed. 253; People's Finance Company v. Burdg, 128 Kan. 390, 277 P. 796; 13 C.J. p. 600, § 622.