### BORIN CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

No. 8477.

Circuit Court of Appeals, Sixth Circuit.

Feb. 14, 1941.

Bayre Levin, of Detroit, Mich. (Levin, Levin & Dill and Theodore Levin, all of Detroit, Mich., on the brief), for petitioner.

Helen R. Carloss, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before ALLEN, HAMILTON, and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

This case arises on petition to review a decision of the Board of Tax Appeals determining deficiencies in income tax against the petitioner for the taxable years 1933 and 1934, in the respective amounts of $442.81 and $8,873.62, and a deficiency in excess profits tax for 1934 in the amount of $2,909.17. 39 B.T.A. 712. The question presented is whether the basis for measuring depreciation and gain or loss from the sale of the petitioner's dry ice plant is the cost of the plant as fixed under an original contract of purchase of October 10, 1930, or as fixed in a new contract entered into November 7, 1932.

The machinery and equipment were sold by the petitioner in 1934, and were acquired subsequent to March 1, 1913. Under the applicable statutes,[1] the basis for measuring gain or loss from the sale in 1934 and for measuring depreciation for the years 1933 and 1934 is the cost of the plant to the petitioner. In computing its depreciation deduction on the plant for the taxable years, the petitioner used as its basis the purchase price recited in the contract of October 10, 1930, and used the same basis in computing the profit realized upon the sale of the plant in 1934. The Commissioner determined that both computations should be calculated on a cost basis representing the purchase price recited in the contract of November 7, 1932.

The case arises out of the following facts:

The petitioner, a Michigan corporation with offices in Detroit, is the assignee of a contract between its principal organizers, referred to in the instrument as Borin Brothers, and the York Ice Machinery Corporation, under which the York Corporation agreed to sell and Borin Brothers agreed to buy a carbon-dioxide plant, to be used in the manufacture of dry ice. York Corporation was to install the machinery in a building to be erected by the pur-

---

[1] Revenue Act of 1932, c. 209, 47 Stat. 169, § 23(k), § 23(m), § 111(a), § 112(a), § 113(a), § 113(b) (1) (A) (B), § 114(a), 26 U.S.C.A. Int.Rev.Acts, pages 491, 510, 511, 514–519.

§ 23(*l*) and (n) of the Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C., § 23, 26 U.S.C.A. Int.Rev.Acts, pages 673, 674, are identical in all material respects with § 23 (k) and (m), respectively, of the Revenue Act of 1932. Sections 111(a), 112(a), 113(a) and (b), and 114 (a) of the Revenue Act of 1934, 26 U.S.C. §§ 111, 112, 113 and 114, 26 U.S.C.A. Int.Rev.Acts, pages 691, 692, 696–701, are identical in all material respects with the corresponding sections of the Revenue Act of 1932.

chaser, and to make it ready for operation. The machinery and equipment were to retain the character of personal property, and title was to remain in the seller until the full price was paid in cash. The contract included a number of guaranties, the principal one being that the machinery would be capable of manufacturing ten tons of dry ice every twenty-four hours, when properly operated in accordance with the instructions of the seller. The guaranties and warranties of the seller, however, were "not to be treated as conditions, but as collateral undertakings entitling the purchaser to all direct legal damages but not to consequential damages for their breach."

The purchase price stated in the contract was $146,800, $12,000 of which was to be paid on execution of the contract and the balance in nine installments. The first payment was made and the plant was accepted by the petitioner, but there were repeated interruptions in operation, and dry ice could not be produced in the quantity agreed, and the quality was inferior. As a result of the petitioner's complaints and by mutual arrangement, the York Corporation operated the plant through the summer season of 1932, the petitioner paying the York Corporation a stated price per pound of dry ice. After adjustments and minor replacements, the York Corporation demonstrated that the plant would produce ten tons of dry ice per day, of the proper quality, and the petitioner then resumed operation. This was the first solid carbon-dioxide plant designed and manufactured by the York Corporation, which, as the petitioner's general manager testified, gives the answer to "why they were so cooperative during this period."

The relationship between the petitioner and the York Corporation was very friendly. During the ten years preceding 1932, the three Borin brothers, who own most of the stock of the petitioner corporation, had purchased several hundred thousand dollars' worth of water ice manufacturing equipment from the York Corporation, and had used York equipment exclusively in six separate complete water ice plants. The equipment so used required replacements from time to time. The York Corporation had loaned the petitioner $10,000 during the period of this transaction, for the purpose of financing the cost of the plant and building.

Because of the initial unsatisfactory operation of the plant, the petitioner refused to make the deferred payments under the contract, claiming damages for operating losses, interest on investment in building and equipment, normal depreciation of the plant during the period, and other consequential damages. In 1932 the parties had various negotiations, which resulted in an understanding that the York Corporation would allow an adjustment in the total amount of $84,800. The parties at first contemplated the allowance of a credit in that amount against the petitioner's liability under the original contract. After returing to the home office, however, the representative of the York Corporation stated that they had decided to handle the matter through the execution of a new contract. In November, 1932, a new contract was executed, which provided that the original contract of October 10, 1930, "is hereby rescinded, and the rights of the parties under the said contract or arising out of the same are hereby mutually cancelled." Under the new contract the York Corporation agreed to sell the plant for $72,467, the receipt of $12,000 of which was acknowledged, but no cash payment was made at the time. The plant was to remain the personal property of the York Corporation until the entire purchase price was paid. The sum of $72,467 to be paid was arrived at by subtracting from the original contract price of $146,800 the amount of losses claimed by the petitioner in the sum of $84,800, and by adding thereto $10,467, which represented the $10,000 loan previously made by the York Corporation to the petitioner, and $467 interest thereon. The $12,000 previously paid by the taxpayer was treated as the cash payment required upon execution of the second contract.

The Commissioner calculated that $62,000, the balance due to the York Corporation under the second contract, was the cost of the plant to the petitioner, and assessed the taxes upon that basis. The Board sustained the Commissioner.

The petitioner claims that the Board erred in determining that the basis for depreciation and for calculating profit upon the sale was the cost of the plant set in the second contract, urging that the record establishes by the uncontradicted facts that the plant was accepted in May, 1931, by the petitioner, in such manner as to preclude rescission of the contract; that the contract of 1930 was not rescinded, and that the difference between the original

purchase price, $146,800, and $62,000, that is to say, $84,800, represented damages paid by the York Corporation, and that the second contract in reality provided for the payment of damages, and was not a contract of sale.

In a controversy between the Commissioner and the petitioner, the petitioner may go behind the written contract and introduce parol evidence in contradiction of the express statements of the instrument. Commissioner v. H. F. Neighbors Realty Co., 6 Cir., 81 F.2d 173. However, upon the testimony adduced, we think that the decision of the Board must be affirmed. While the evidential facts are not in controversy, more than one finding of fact may be deduced from the evidential facts, and the findings of the Board are binding upon this court if supported by the record. The contract of 1930 was never consummated in such manner as to preclude rescission. Although the buyer acknowledged that the plant conformed to the specifications, since no deferred payment was made, title was retained by the seller, and did not vest in the buyer until completion of the payments provided for in the new contract of 1932. The principal agreements of the contract of 1930 still remained unexecuted in November 1932. It cannot be denied that the parties were at liberty to rescind their contract as to such executory obligations (Savage Arms Corp. v. United States, 266 U.S. 217, 220, 45 S.Ct. 30, 69 L.Ed. 253), nor that in the new contract of 1932 apt words were used to effect a rescission. But the gist of the petitioner's argument is that the parties intended something contrary to the express terms of the contract, namely, that the contract amounted to a credit of $84,800, agreed upon as damages to the taxpayer, and that the purchase price remained $146,-800, as originally agreed. It contends that this is established without contradiction, because a representative of the York Corporation made an informal agreement with the petitioner that the York Corporation would allow an adjustment of the transaction in the total sum of $84,800, "agreed upon as damages and set off against the balance of petitioner's liability of $134,800." But the York Corporation was unwilling to give a credit memorandum in this amount, and insisted that the matter be disposed of through the execution of an entirely new contract, in which, under elementary rules of law, the previous negotiations were merged. This contract, deliberately executed, shows that the York Corporation did not, as contended, agree that the petitioner had an enforceable claim against it for $84,800. The first contract provided that the York Corporation should not be liable for consequential damages, and the so-called account stated, which preceded the contract of 1932, covered mainly consequential damages. The original contract stated that failure to give written notice within thirty days of any defects in the plant would constitute complete acceptance by the purchaser, and no such notice was given. The York Corporation at no time admitted that it was liable under the contract for $84,800, nor for any amount, and its insistence upon the execution of the new contract shows that it was unwilling to admit liability. The conclusion drawn by the Board is supported by the record. It is evident that the York Corporation was willing, as a matter of good business, to make adjustment with its "very good customer" over the unsatisfactory operation of the first dry ice plant that it had constructed. This was necessary if it was to design and sell other dry ice plants. As a part of that adjustment, the York Corporation sold and the petitioner bought the plant at a greatly reduced figure. The petitioner joined in the contract of November 7, 1932, which expressly rescinded that of 1930 and effected a contract of sale. Under the facts of this record it cannot contend that this agreement, deliberately executed, did not carry the legal consequences which attached to the language employed by it. The purpose of the contract is found in the agreement of the parties. Helvering v. Coleman-Gilbert Ass'n, 296 U.S. 369, 373, 56 S.Ct. 285, 80 L.Ed. 278. The price fixed in the second contract is the proper basis for the taxes questioned, and the Board was correct in sustaining the Commissioner.

There would be no difficulty in arriving at this conclusion were it not for an additional question which, while not included in the assignments of error of the petition for review nor discussed in petitioner's briefs filed before the hearing, is mentioned here because of the insistence of counsel in oral argument. In 1935 the petitioner filed an amended return for 1932, reported therein the receipt of additional income in the sum of $57,482.44, designated as profit realized in 1932 on the

transaction which resulted in the contract of November 7, 1932, and paid taxes thereon in the principal sum of $3,999.29, together with interest in the amount of $479.-91. However, an allowance of a claim for over-assessment had been recommended on this item by the internal revenue agent, and the petitioner, by its failure to file a claim, as notified by the Commissioner, had permitted the statute of limitations to run, so that the Commissioner could not, under the applicable sections, allow credit in this particular. § 322(b) (1), Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 733. The petitioner again at the hearing before the Board claimed this amount as a credit, in the event that the Board should decide that the cost basis under the contract of 1932 controls. Under the circumstances of this case the Board properly pointed out to the petitioner that since the statute had run, its claim must be asserted under § 820 of the Revenue Act of 1938, 52 Stat. 581, 26 U.S.C.A. Int.Rev.Code, § 3801.

The decision is affirmed.