## MID-STATE PRODUCTS CO. v. COMMODITY CREDIT CORP.

No. 10513.

United States Court of Appeals, Seventh Circuit.

May 13, 1952.

See also, 10 F.R.D. 592.

Fred H. Kelly, Mattoon, Ill., Harry C. Partlow, Casey, Ill., Craig Van Meter, Mattoon, Ill., for appellant.

Isidor Lazarus, Department of Justice, Washington, D. C., William W. Hart, U. S. Atty., Ernest R. McHale, Asst. U. S. Atty., East St. Louis, Ill., for appellee.

Holmes Baldridge, Asst. Atty. Gen., Marvin C. Taylor, Department of Justice, Neil Brooks, Associate Solicitor, Department of Agriculture, Katherine Markwell, Department of Agriculture, all of Washington, D. C., of counsel for defendant-appellee.

Before MAJOR, Chief Judge, and KERNER and FINNEGAN, Circuit Judges.

KERNER, Circuit Judge.

This appeal is from an order dismissing on the merits and with prejudice plaintiff's counterclaim contained in its reply to defendant's counterclaim to plaintiff's complaint. The order reserved the issues in the main suit for subsequent trial but expressly found, pursuant to Rule 54(b), Federal Rules of Civil Procedure, 28 U.S. C.A., that there was no reason for delay in judgment on plaintiff's counterclaim. The issue raised by this appeal is the validity and enforceability of certain amendments to two contracts to which plaintiff asserts it was compelled to agree by reason of business compulsion and economic duress.

The controversy arose out of a series of contracts for the sale to the Government of quantities of dried egg powder processed by plaintiff. The Government, acting through the Commodity Credit Corporation, defendant here, and the Federal Surplus Commodity Corporation, in 1941 embarked upon a program designed to increase the purchasing power of farmers and, at the same time, facilitate the exportation of agricultural commodities and, generally, to establish stable marketing conditions for such products. Eggs were among the commodities listed, and the plan contemplated the procurement and export of large quantities, processed as dried egg powder. At the time, facilities for such processing were wholly inadequate and construction of new facilities was encouraged.

Plaintiff had been organized in 1941, with a capital of $25,000, to enter the frozen egg field, but after investigation of the possibilities of the powdering process changed over to that business. Its principal stockholder was John Nunamaker who had been a dealer in shell eggs for several years, doing business as Mid-State Egg Company. In July, 1941, plaintiff received a "letter of intent" from the Surplus Marketing Administration to the effect that if it constructed the facilities contemplated in earlier negotiations between plaintiff's officers and the Department the latter "will purchase from you, at reasonable price levels in accordance with our normal offer and acceptance procedure and provided that prices at which you offer eggs are competitive with other offers we receive, your entire plant's production up to 3,000,000 pounds." The letter further stated that although it was clearly understood that no commitments were made for any period beyond June 30, 1942, "should the dried egg purchase program be continued, your con-

418

cern will receive equitable consideration with all other firms producing dried eggs."

In reliance on this assurance plaintiff proceeded to acquire a plant in which it installed all the equipment necessary for the business at an initial cost of over $200,000, and new equipment later, bringing its investment up to $271,830 by November, 1942, and over $330,000 by November, 1944. The plant and equipment were not adapted to any other use; in 1941 it was contemplated that the program would continue for five years, and plaintiff was allowed to amortize its plant over that five-year period.

Contracts were entered into, and deliveries started early in 1942. By April 21, 1944, plaintiff had delivered over 12,000,000 pounds of dried egg powder and had received $13,464,343 in payment. At that time plaintiff was operating at full capacity, using 14,400 cases of eggs a week, and financing its operations by loans from a St. Louis bank, secured by assignments of the contracts and warehouse receipts covering all its raw and processed materials. The parties were then dealing under Contract No. FSC 34883, accepted March 16, 1944, and providing for deliveries up to August 30, 1944, at prices starting with $1.142 a pound and going up to $1.202 a pound. A later contract, No. 35686, accepted March 25, provided for the delivery of 478,800 pounds during September, 1944, at a price of $1.212 a pound. All the contracts provided for premium payments for higher quality than the standard requirements.

While it was stated that the price offerings were to be on a competitive basis, it appears that in fact, prices were determined for each contract by defendant on the basis of the cost of the eggs to be processed, plus an allowance of 15 cents a pound of the powder to cover processing costs and profit. Ceiling prices were imposed on shell, frozen and dried eggs in 1943, and thereafter the ceiling prices for shell and frozen eggs were used in computing the raw material cost. Until late in March, 1944, market prices for shell eggs had approximated ceiling, but toward the end of March and early in April they began falling sharply and many of the egg processors began buying up eggs at low prices to fill their commitments. Since the Government was then required by law to support egg prices at 90% of parity, defendant was faced with the dilemma of having to make up the losses to the egg producers while at the same time having to pay the fixed prices based on ceiling to the processors. And incidentally, while the contracts with the processors contemplated a margin of profit based on the estimated cost of material at ceiling plus processing, many who were able to buy up their eggs at the lower prices could as a result make very much larger profits.

Under these circumstances defendant decided that the existing contracts with all processors must be amended in order to make sure of the payment by them of support prices to the producers. It called a meeting of the Industry Advisory Committee composed of representatives of the egg processors, and after lengthy discussion, with the advice and assistance of the committee, prepared amendments providing for the substitution of a cost-plus in place of the fixed price basis, certification by the processor of his costs, and inspection by defendant's agents of all plant equipment, materials, and accounts. A telegram was sent out April 21 to all processors explaining the reasons for and provisions of the amendments, and demanding that they be confirmed at once. April 29 a second telegram was sent, referring to a letter of clarification and again demanding immediate confirmation on threat of cancellation of the contracts. Plaintiff confirmed the amendments by wire on May 2 but asked to be relieved of July and August deliveries. Defendant refused the cancellations and asked for specific confirmation of the amendments as to all deliveries required after May 1. On May 2 the Industry Association sent out a letter stating that the April 29 telegram had been explained by defendant to mean that unless unqualified acceptance of the amendments was received, all contracts would be cancelled including powder on hand, and that lack of cooperation on the part of the processors would result in Government operation of the plants.

Plaintiff did not immediately confirm the amendments after denial of its May 2 request for relief. It protested generally the right of defendant to amend the contracts, and specifically objected to the application to itself of one paragraph relating to the allowance of only a two-cent a dozen markup for purchases of eggs from an affiliate. However, it did continue operations and made deliveries which it billed on the amended price basis after May 2. Defendant accepted all deliveries but refused to pay for those after May 2 until it received formal confirmation of the amended contracts. As of June 6, plaintiff had on hand raw and processed eggs of a value of over $900,000; defendant owed it over $652,000; and it owed the St. Louis bank $1,132,842. So far as it knew, there was at that time no other market for dried egg powder, and its plant was not adapted to conversion to any other business without great expense, nor could it dispose of its stock of shell and frozen eggs at forced sale without substantial loss. It therefore, on June 6, wired its acceptance of the amended contracts, whereupon it immediately received payment for the deliveries from May 2 to that date.

Plaintiff fulfilled all commitments under both March 1944 contracts, billing defendant for the amounts due on the amended basis without protest or notification of any further claims under the original contracts. After those two were fully executed plaintiff continued to do business with defendant on the same amended basis under a new series of contracts. By November 30, 1944, having executed the March contracts and one additional one, plaintiff had a net surplus of $213,347 in addition to sufficient assets to pay off its $25,000 capital stock. During 1945 it delivered 1,197,000 pounds, receiving $1,335,433 in payment.

In 1945 a new controversy arose between plaintiff and defendant as to the right of the latter to inspect the books and records of plaintiff's affiliate, the Mid-State Egg Company, which was individually owned by Nunamaker, plaintiff's president, manager, and principal stockholder. Prior to June, 1944, plaintiff had purchased all its eggs from this affiliate but because one of the amendments allowed only a two-cent markup for purchases from an affiliate, plaintiff decided to arrange for its own purchasing setup. The controversy had to do only with the records of purchases from May 2 until this new arrangement. Plaintiff still refrained from any contention that the amendments were voidable for duress, and continued contract relations, bidding for and receiving contracts even after the filing of this suit, all of which were duly executed. In February, 1946, plaintiff agreed to the inspection of its affiliate's records, and thereafter the only argument between the parties had to do with plaintiff's liability for the alleged overpayments under the March 1944 contracts, and the manner of offsetting such liability, if any. To repeat, all contracts executed after fulfillment of the March 1944 ones were on the amended basis, and plaintiff never challenged the validity of those on the ground of duress until the filing of the reply and counterclaim here in issue. In the meantime, it made delivery of egg powder under later contracts for which it received $3,547,993 in 1946 and 1947.

The court found from these facts that plaintiff had been subject to duress and economic compulsion in May and June, 1944, when it was compelled to accept the amendments; that such duress rendered the amended contracts voidable at that time; and that plaintiff then had no adequate legal remedy. It further found, however, that plaintiff's subsequent conduct, its failure to assert its claim with due promptness after all danger of business failure had disappeared as it had in November, 1944, operated as a waiver of its right to rescind, requiring dismissal of its counterclaim asserting that right.

Plaintiff asserts that there was no waiver of its right to rescind for duress which the court found existed until November, 1944, and defendant insists that there was no right to rescind at any time, before or after November, 1944, and that affirmance of the judgment should be on the broader base that the amendments were not voidable for duress.

We have no doubts as to the correctness of the court's ruling on the issue of waiver.

If, because of its circumstances in May and June of 1944, plaintiff felt compelled to accept the amendments to its contracts rather than risk financial ruin, we agree with the court that when that risk was removed, it was under a duty to assert its rights within a reasonable time. Instead of that, as the court said, "plaintiff pursued the expedient policy of hiding its purpose until it seemed that the possibilities of profiting further through defendant had largely been exhausted. In the meantime, several years had elapsed and it had done further business with defendant to the extent of several millions of dollars on numerous additional contracts all of which for October 1944 and throughout 1945 were similar in form and content to the objectionable amendments. As time passed such conduct was increasingly inconsistent with an intention to seek to disaffirm the amendments and increasingly evidenced an intention not to do so."

Plaintiff relies on cases to the effect that the influence of duress must be wholly removed before conduct constituting waiver, estoppel or laches becomes effective to bar its right to relief. We think the court took that principle fully into account in reaching its conclusion, calling attention to the fact that by November, 1944, plaintiff was no longer in a critical financial condition, fearing the possibility of bankruptcy if it resisted the amendments to its contracts. Thereafter its only fear was that if it served notice of its alleged claims under the original contracts defendant might refuse to give it any further contracts, so that it might lose a very profitable source of business.

■ We find no error in the court's ruling that plaintiff waived its rights, if any, to disaffirm the amendments by its delay of four and a half years after the right accrued and four years after the financial crisis giving rise to the duress disappeared.

We pause now to consider defendant's contention that it is entitled to have the judgment in its favor rest on the broader ground that there was no duress and that the amendments were valid. The argument is that a threat to cancel a contract does not in itself constitute duress, and that plaintiff's precarious financial condition did not create liability on defendant for duress. Silliman v. United States, 101 U.S. 465, 25 L.Ed. 978. Defendant says that the entire transaction was reasonable and profitable, hence it negatives duress. United States v. Bethlehem Steel Corp., 315 U.S. 289, 62 S. Ct. 581, 86 L.Ed. 855.

■ There can be no doubt of the right of the parties to an executory contract to amend its provisions. As the Court said in Savage Arms Corporation v. U. S., 266 U. S. 217, 220, 45 S.Ct. 30, 31, 69 L.Ed. 253 " * * * parties to a contract may release themselves, in whole or in part, from its obligations so far as they remain executory, by mutual agreement without fresh consideration. * * * " This was precisely what defendant sought here. The circumstances at the time were extraordinary. Defendant, an agency of the Government, operating in the public interest, had inadvertently involved itself in a contract which required it, on the basis of the fixed price provision, to pay prices resulting in exorbitant profits to some processors taking advantage of the break in the market prices for eggs, while the Government was required by law to support prices paid to egg producers. In this emergency it called representatives of the entire industry together for an industry-wide adjustme. of the contracts. And it appears of record that plaintiff was the only processor in the entire industry who ever challenged the validity of the amendments although during the course of the conference there were protests raised. Plaintiff had entered into the business on the basis of an agreement that prices would be competitive, and a promise of "equitable consideration with all other firms producing dried eggs." While financial ruin might have been the alternative to acceptance of the amendments, it is certain that invalidating them on grounds of duress and permitting plaintiff to recover the potentially exorbitant profits permitted under the original contracts would place its competitors who accepted the amendments at an unfair disadvantage. And again, while financial ruin might have followed rejection of the amendments, there certainly can be no question here but that their acceptance and the subsequent contin-

uation of contractual relations between plaintiff and defendant resulted in very profitable business for plaintiff.

In this situation we have some doubt as to the merits of defendant's contention and hence we are not prepared to say that there was no duress. Compare Hartsville Oil Mill v. United States, 271 U.S. 43, 49, 46 S.Ct. 389, 70 L.Ed. 822. However, this being an equitable proceeding, we are convinced that plaintiff is not entitled, either because of the circumstances at the time of the amendments or because of its subsequent conduct, to have the amendments avoided and cancelled on the basis of such duress.

Judgment affirmed.