**AIR CONDITIONING COMPANY OF HAWAII, Plaintiff,**

v.

**RICHARDS CONSTRUCTION COMPANY–KANEOHE BAY PROJECT, Barry J. Richards Co., Bayrich, Inc., Bayrich Inc. of California, Barry J. Richards, Inc., Richards Construction Company, Massachusetts Bonding and Insurance Company, Barry J. Richards, and Gertrude Richards, Defendants.**

**Civ. No. 1924.**

United States District Court
D. Hawaii.
Second Division.
Nov. 28, 1961.

—◆—

Smith, Wild, Beebe & Cades (Gilbert E. Cox and James S. Campbell), Honolulu, Hawaii, for plaintiff.

A. William Barlow, Honolulu, Hawaii, for defendants.

PENCE, Chief Judge.

On December 4, 1957, invitations for bids for the construction of six hundred fifty (650) housing units at the United States Marine Corps Air Station at Kaneohe Bay, Oahu, T. H., for the Department of the Navy, Housing Contract No. NBy (CH)–12526 were sent to interested contractors. The bids, ultimately, were to be opened at 11:00 a. m. on Friday, January 31, 1958, at the District Public Works office at Pearl Harbor, Oahu.

Among the interested contractors was the defendant, Richards Construction Company[1], and in the "Builders Report of Hawaii" of January 20, 1958, appeared a half-page advertisement of the defendant requesting sub bids for the project. This advertisement showed the address of the Richards Construction Company to be 4811 Whitsett Avenue, North Hollywood, California, and also announced that the company's representative would be at the Surfrider Hotel on January 28, 29, 30 and 31. This advertisement was seen by Allen Arasato, foreman of the sheet metal department of the plaintiff.

On January 30, 1958, the plaintiff filed a bid on Section 6 of the Housing Project Specifications: sheet metal work, at the figure of $48,733.00, with the General Contractors Association of Hawaii, and either on that day or on the morning of Friday, January 31, the same bid was telephoned to the defendant, Barry J. Richards, who was the general manager of all of the defendants' interests (except Massachusetts Bonding and Insurance Company), at the Surfrider Hotel by Arasato.

The defendant[2], as a general contractor, had already secured bids from mainland United States contractors on this same item—one for $173,395.00 and another for $83,277.00. The defendant had been prepared to use an $83,000.00 figure for the sheet metal work prior to receiving Arasato's call. Relying on Arasato's call and a reconfirming call in which Richards advised Arasato that he was using the plaintiff's figure as lowest on the sheet metal work, Richards adjusted his figures for the sheet metal work to $48,733.00 and on Friday, January 31, 1958, defendant Richards Construction Company by Barry J. Richards, general partner, submitted a bid

---

[1]. The defendant Richards Construction Company-Kaneohe Bay Project is a general partnership consisting of the following defendants: (1) Bayrich, Inc., (2) Bayrich Inc. of California, (3) Barry J. Richards, Inc., (4) Barry J. Richards Co., and (5) Richards Construction Company, a limited partnership. This limited partnership is in turn made up as follows: (a) Barry J. Richards, an individual and a general partner, (b) Barry J. Richards, Trustee of the Barry J. Richards Trust for Susan Beth Richards, a limited partner, and (c) Gertrude Richards, Trustee of the Gertrude Richards Trust for Susan Beth Richards, a limited partner. The Massachusetts Bonding and Insurance Company was the surety on the bond on the general contract, said bond being issued for the protection of all persons supplying labor and materials used in the prosecution of the work on the contract. The Richards Construction Company by and through its general partner, defendant Barry J. Richards caused to be formed defendant Richards Construction Company-Kaneohe Bay Project, a partnership, which partnership by and through all of its general partners undertook the performance of said building contract.

[2]. Because of the complex make-up of the various "Richards" partnerships, corporations, etc., the term "defendant", as used throughout this decision, usually but not necessarily refers to the Richards Construction Company and on occasion to Barry J. Richards himself, inasmuch as he apparently was the sole manager of all of the "Richards" operations.

of $8,794,085.00 for the entire project. When the bids were opened at 11:00 a. m. on that day, the defendant was the low bidder. The Saturday morning, February 1, 1958, Honolulu Advertiser carried the bid story.

The plaintiff was not open for business on Saturday, February 1, but on Sunday, Arasato, knowing that the defendant was the low bidder and having been advised that defendant was using plaintiff's figure, rechecked the figures of the plaintiff's bid and discovered that plaintiff's employee, Albert Sakuda, the actual estimator, had mistakenly used labor and material costs on fabricating galvanized sheet metal whereas the job Specifications called for zinc alloy metal. Arasato immediately determined that the cost of zinc alloy was about twice that of galvanized sheet metal.

On Monday morning, February 3, 1958, Arasato notified J. Q. Quealy, Jr., general manager of the plaintiff corporation, of the mistake. Although the exact difference in cost was not at that time available, it was known to be considerable. Quealy immediately notified Arasato to contact the low bidder. Arasato was unable to contact Richards at the Surfrider Hotel, but made no attempt to contact defendant in California. Richards had returned to California and did not come back to Hawaii until March 3, when Richards found a memorandum that he should call Arasato at the plaintiff company. He called and, about March 6, Arasato, for the first time, saw Richards at the Surfrider Hotel to tell him that the plaintiff had made a mistake and "would like to withdraw their figures." The defendant "blew up." The next day the defendant saw Quealy at the plaintiff's office and Quealy advised him that the plaintiff was not going to do the job at the bid price.

On March 11, the defendant wrote the plaintiff formally accepting its confirmed offer of January 30, 1958 to do the sheet metal work for $48,733.00. The plaintiff under date of March 25 wrote the defendant construction company that it did not consider itself under any contractual obligation to go through with its offer and claimed that its offer had been withdrawn.

About a week later, Richards came back and discussed the possibility of using copper in place of zinc alloy. Whether this possible use of copper was initiated by the defendant or by the Navy itself is not clear. In any event, figures for copper were secured in March of 1958. On July 14, 1958, Richards wrote to the District Public Works Office Fourteenth Naval District, proposing changing all zinc flashings to 16 oz. copper and indicated that there would be an increase in cost. The plaintiff's estimated price for using copper was $96,000.00.

There was some confusion as to when Richards again contacted the plaintiff requesting the plaintiff to work out a bid on the sheet metal work using zinc alloy. It may have been shortly before or after July 10, 1958, but in any event Richards came to the plaintiff in the summer of 1958 and said that he had endeavored to get prices from other contractors on sheet metal work using zinc alloy and that the Navy had refused to use copper and that he wanted the best possible figure from the plaintiff on a zinc alloy basis. The plaintiff gave to the defendant an offer to do the sheet metal work for $68,761.00. After some hard bargaining, the plaintiff reduced its figure to $62,000.00, and, under date of September 28, 1958, the plaintiff and the defendant entered into a formal written contract whereby the plaintiff agreed to do the sheet metal work on the project for $62,000.00.

As the work progressed, the defendant paid the plaintiff a total of $50,582.-70. Then, when the plaintiff had completed its work, satisfactorily, the defendant company refused to pay any more. In addition to that, the plaintiff had performed extra work to the reasonable value of $302.01. This also the defendant refused to pay for. Suit was brought by the plaintiff for the above sums. The defendant counterclaimed alleging that the only contract price was

$48,733.00, and that therefore the defendant had over-paid the plaintiff in the sum of $1,849.00.

Both the plaintiff and the defendant companies have as their managers men who are ruthless in the pursuit of profit and neither Mr. Richards nor Mr. Quealy, Jr., impressed the Court with the accuracy of their respective statements. As the Court advised counsel in Chambers shortly after the trial had started, it clearly appeared to the Court that Barry Richards was parsimonious with the truth. Later, it was equally clear to the Court that the observation of the late Dr. Sigmund Freud that "a person forgets what he wants to forget" might well be applied to the testimony of Quealy and certain other employees of the plaintiff. Defendant Barry Richards obviously is a tough and rough, smart, sharp general contractor who feels that the contracting business is one in which no holds are barred. Although the attitude of Quealy, Jr. was externally much more suave, the Court was convinced that he too held the same general attitude toward the contracting business as does the more outspoken Mr. Richards. The Court was at all times faced with the task of sifting fact from fiction as well as forgetfulness that was tantamount to fiction.

The first legal problem which the Court had to determine was whether or not a contract had been entered into between the plaintiff and the defendant at the $48,733.00 figure submitted by the plaintiff.

There was testimony from Mr. Richards that he had twice checked with Arasato as to the accuracy of the plaintiff's figures and that, after he was notified that his construction company was low bidder, he had on that same afternoon of Friday, January 31, contacted Arasato and in effect accepted plaintiff's bid. This "acceptance" is not supported by the Richards Construction Company letter of March 11, 1958 (Ex. 8) to the plaintiff and the Court therefore does not believe that plaintiff's bid was accepted on January 31, 1958.

The plaintiff's contention is that, even though it filed its bid with the General Contractors Association and telephoned its bid to the defendant, it had no enforceable contract with the defendant company; that its bid amounted to a revocable offer; and that the plaintiff communicated its revocation to the defendant before the defendant accepted it.

Admittedly, the filing of the bid was not an option supported by a consideration nor on the state of the record would there appear to be a bilateral contract binding the defendant to use the plaintiff's bid. On the other hand, plaintiff's bid nowhere stated either expressly or impliedly that it was revocable at the pleasure of the plaintiff before acceptance. Ex. J, "Important Principles of the Bidding Procedure of the General Contractors Association of Hawaii", showed the basis upon which the bid was filed, viz., that after the bid deadline the bidding procedure rules of the Association forbid a change in bidding figures and if a bid contains an error it must be withdrawn *before* the general bid opening. As the principles of the Association state: " * * * The salvation of each member's business and the industry lies in abiding by the Bidding Procedure and playing the game in an honest way. * * * " The plaintiff's bid (Ex. 2) filed with the General Contractors Association of Hawaii had no limitation as to how long it would remain open. The space provided for fixing such a limitation was left blank. The plaintiff's bid constituted a promise on its part to do all of the sheet metal work according to the specifications. The plaintiff certainly had reason to expect that, if its bid was lowest, that bid would be used by the defendant. Plaintiff's bid was intended to induce action of a definite and substantial character on the part of the promisee, Richards Construction Company, and it did. The Court is fully satisfied that Richards Construction Company advised plaintiff that it was going to use the plaintiff's figure in its

bid on the sheet metal work, and that the defendant did so use it.

Section 45 of the Restatement of the Law of Contracts provides:

"If an offer for a unilateral contract is made, and part of the consideration requested in the offer is given or tendered by the offeree in the response thereto, the offeror is bound by a contract, the duty of immediate performance of which is conditional on the full consideration of being given or tendered within the time stated in the offer, or, if no time is stated therein, within a reasonable time."

And Comment b. on that section states that:

"* * * The main offer includes as a subsidiary promise, necessarily implied, that if part of the requested performance is given, the offeror will not revoke his offer, and that if tender is made it will be accepted. Part performance or tender may thus furnish consideration for the subsidiary promise. Moreover, merely acting in justifiable reliance on an offer may in some cases serve as sufficient reason for making a promise binding (see § 90)."

The subsidiary promise serves to prevent the injustice which would result if the offer could be revoked after the offeree had acted in reliance thereon to its detriment and this foreseeable prejudicial change in position implies a subsidiary promise not to revoke an offer for a bilateral contract.

Section 90 of the Restatement of the Law of Contracts states:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

This Court is of the opinion therefore that the plaintiff in making its bid of January 30, 1958 made a promise which it should have reasonably expected would induce the defendant to submit a bid based thereon to the Government, that such a promise did induce this action, and that an injustice would have been avoided only by enforcement of the promise. (See Drennan v. Star Paving Company, 51 Cal.2d 409, 333 P. 2d 757.)

Although there was some evidence that the defendant thought that the plaintiff's bid was too low and hence inferentially there was knowledge that the plaintiff had made a mistake in its bid, the Court does not believe that the defendant did have any knowledge, prior to March 6, 1958, that the plaintiff had made a mistake in its bid. There was a variance of $90,000.00 between two mainland bidders on the same sheet metal work and the difference between plaintiff's bid and the next above it was but $34,000.00. Also, the plaintiff's bid was $32,000.00 above the architect's estimate on the sheet metal work. Although the Court is satisfied that later Richards told Quealy that he had been carrying a $62,000.00 figure on the sheet metal work, the Court was convinced that this was but a part of the several and mutual misrepresentations made by Richards and Quealy, Jr. to each other in the course of bargaining over the price for which the plaintiff ultimately agreed to perform the work. Neither the plaintiff nor the defendant exhibited very clean hands to the Court in their entire series of transactions. Both the plaintiff and the defendant were *out* to make as much profit as possible *out* of each other without regard to business ethics and "good faith".

The Court finds therefore that an enforceable contract was entered into by the defendant with the plaintiff—not necessarily on March 11 when the defendant wrote his letter of acceptance— but certainly by March 6 on the very date when Arasato first told the defendant at the Surfrider Hotel that "my man

made a mistake and we would like to withdraw our figures." It was clear to the Court and the Court so finds that upon that occasion Richards by his words and actions clearly indicated that he had relied upon the plaintiff's bid of $48,733.00, had used it in making his own bid as general contractor, and, by his words and actions with Arasato on that day and with Quealy on the following day, clearly indicated that he accepted plaintiff's bid.

Immediately thereafter circumstances took place which are a little unclear to the Court. Although Richards testified that the idea of using copper originated with him, nevertheless his letter of July 14 to the District Public Works Office, Fourteenth Naval District (Ex. O) leads to the inference that the Naval District itself had requested Richards to evaluate a change of all zinc flashings to 16 oz. copper. The Court is satisfied from plaintiff's Exs. 21 and 22, viz., radiograms, that as early as March 12, 1958 Richards was calling upon the plaintiff for a modification of the contract by way of substituting copper for zinc.

In August or September 1958, the problem confronting the plaintiff and defendant was crystalized. The defendant had to go ahead with his general contract. The plaintiff was refusing to perform on his $48,733.00 bid and contract. The defendant had tried to secure bids elsewhere but the lowest figure he could get was that of the Oahu Plumbing for $79,889.00.

The defendant went back to the plaintiff and asked the plaintiff to rebid the job using zinc. Thereupon, the plaintiff tossed the purely "guesstimated" bid of $68,761.00 to the defendant. The defendant, feeling that he was "dealing with a chiseller", represented that he had a mainland bid of $62,000.00 and that he had allocated that figure for the sheet metal work and was willing to pay plaintiff that much for the work if plaintiff would do it, and the plaintiff, with a great show of being fair and honorable, advised the defendant that, "because he felt a moral obligation to do so", he would reduce the bid by the margin of his profit—ten per cent—and do the job "at cost" for $62,000.00. In these respects the statements of neither the plaintiff nor the defendant were in the slightest degree true. It was in this frame of mind, and with the firm intention on the part of the defendant not to pay any more than he would be forced to because of work completion and by a court, that the plaintiff and the defendant entered into the contract of September 29, 1958 (Ex. 3) whereby the defendant agreed to pay the plaintiff $62,000.00 for doing the same job which the plaintiff had previously promised to do for $48,733.00.

It is argued by the defendant that there was no consideration for this "contract of September 29, 1958" and therefore it was unenforceable.

This Court, having found that a contract between the plaintiff and the defendant was entered into in March 1958, and that the plaintiff refused to perform as promised, is of the opinion that if thereafter the defendant had awarded the contract for the sheet metal work to any person other than the plaintiff he could then have taken legal action against the plaintiff for all of his costs in excess of the plaintiff's original bid. The defendant had these rights, but he did not choose to enforce them. Instead, in the face of the plaintiff's refusal to perform as promised, the defendant went back to the plaintiff and as he said:

"I did my best to compromise the figure down to whatever possible figure I could get them (plaintiff) to perform * * *."

"I would be glad to bring it (the sheet metal work) down to 48,000, 49,000 or 50,000 because of the amount of exposure I had. I was interested in getting the lowest possible bid I could with the amount of exposure I had * * *."

"I have no intention of paying him (plaintiff) over that amount ($48,733.00) or any reasonable amount over that that we might

have to pay to keep him on the job * * *."

"It's good business practice to get anything down to the lowest price * * *."

Thus it was clear that the defendant entered into the formal contract of September 29, 1958, not for the purpose of mitigating damages for the plaintiff, but rather for the purpose and consideration of limiting his own company's exposure.

■ As is set forth in the Restatement of the Law of Contracts, § 406, Comment a., " * * * Where, however, there is a bilateral contract, and each party is still subject to some duty thereunder, the agreement of each party to surrender his rights under the contract affords sufficient consideration to the other for his corresponding agreement * * *." and Comment b., " * *. * if either party even wrongfully expresses a wish or intention to abandon performance of the contract, and the other party fails to object, there may be * * * circumstances justifying the inference that he assents * * *." It has been stated many times "the right to contract includes the right to modify, change or abrogate a pre-existing contract and the mutual promises of the parties are sufficient to support the new agreement." (Cases on all fours with the present problem of refusing to perform a pre-existing contract at any agreed price but subsequently performance at a new and higher agreed price are Bishop v. Busse, 69 Ill. 403; Cooke v. Murphy, 70 Ill. 96 (both decided by the same Judge). The same rule of law was applied in Grant Marble Co. v. Abbot, 142 Wis. 279, 124 N.W. 264. The same principle was applied in Evans v. Oregon & W. R. Co., 58 Wash. 429, 108 P. 1095. It was also more recently followed in United States for Use of Sparling Steel Co. v. Slater (D.C.Alaska), 111 F.Supp. 418. As was said in Savage Arms Corp. v. United States, 266 U.S. 217, 220, 45 S.Ct. 30, 31, 69 L.Ed. 253, "the parties to a contract may release themselves, in whole or in part, from its obligations, so far as they remain executory, by mutual agreement without fresh consideration. The release of one is sufficient consideration for the release of the other." This rule was applied in Borin Corp. v. Comm'r of Internal Revenue (6th Cir.), 117 F.2d 917, 920.)

■ The Court finds that there was adequate consideration on both sides to support the formal contract of September 28, 1958 modifying the informal contract of March 1958. The plaintiff could not be compelled to do the sheet metal work (he was only liable for any damages suffered by the defendant). There had already been moves toward modifying the informal contract of March 1958 by substitution of copper and Richards himself stated that in entering into the formal contract of September 28, 1958 he was compromising his dispute with the plaintiff solely for the defendant's benefit. The Court finds therefore that the terms of that September contract were binding on both parties thereafter. The plaintiff having fully performed that contract is entitled to be paid in accordance with its tenor.

Let Judgment be entered for the plaintiff against the defendants in the sum of $11,417.00, this being the remaining amount due under the contract, together with interest at the rate of six per cent per annum from July 25, 1960, that being the date on which the defendant was billed for same.

In addition thereto, the Court finds that extras to the value of $302.01 were performed by the plaintiff at defendant's request and that the plaintiff has not been paid for the same. Let Judgment be entered in favor of the plaintiff against the defendants in the additional sum of $302.01 on account of the extras, together with interest at the rate of six per cent per annum from August 20, 1960, that being the date on which the defendant was billed for the same.

Defendants shall take nothing by their counterclaim.

Costs will be allowed the plaintiff.