47 F.3d 551
 Pens. Plan Guide P 23909R
Charles E. LAMB, James D'Amore, John F. Bradley, William C.
Munroe, on behalf of himself and all other
persons, Plaintiffs-Appellees,
v.
EMHART CORPORATION, B & D Inc., and Black & Decker
Corporation, Defendants-Appellants.
 No. 724, Docket 94-7575.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 2, 1994.
Decided Feb. 13, 1995.
 
 Erin M. Kallaugher, Hartford, CT (Mark B. Seiger, Halloran & Sage, of counsel), for plaintiffs-appellees.
 Dennis O. Brown, Hartford, CT (David G. Hetzel and Mary L.B. Betts, LeBoeuf, Lamb, Greene & MacRae, of counsel), for defendants-appellants.
 Before: MINER, JACOBS and PARKER, Circuit Judges.
 PARKER, Circuit Judge:
 
 
 1
 Plaintiffs-Appellees John Bradley and Charles Lamb brought this action in the District of Connecticut for damages arising out of an alleged breach of contract.[1] Following a bench trial before Judge Alan H. Nevas, judgment was entered for the Plaintiffs. Defendants Emhart Corporation et al. appealed, contending that the District Court erred in finding that certain amendments to its employees' Stock Option Plans adopted by Emhart on December 22, 1988 applied to options held by the Plaintiffs at the time of their separation from Emhart, and that Emhart had failed to meet its burden to prove the elements of accord and satisfaction. We now uphold the decision of the District Court.
 
 BACKGROUND
 
 2
 Plaintiffs are former employees of Emhart Corporation. In November 1988 both men were notified that due to corporate reorganizations which had eliminated their positions they were to be terminated effective January 31, 1989. At the time, Bradley, who had worked at Emhart for 19 years, was President of the Hardware Division and Lamb, who had worked at Emhart for three years, was Director of Advanced Engineering and Manufacturing Technology.
 
 The Termination Agreements
 
 3
 In early December 1988 both men signed Termination Agreements enumerating the benefits they would receive upon their termination. The Termination Agreements described benefits such as severance pay, extended medical coverage, pension benefits, accrued vacation pay, and access to the Emhart Employee Assistance Program and career management counseling. The Termination Agreements also provided that:
 
 
 4
 Any rights which you may have following your separation date under outstanding stock options granted to you will be determined in accordance with the terms of the respective stock option plans under which the options were granted and in accordance with the terms of the respective option agreements evidencing such stock options.
 
 
 5
 The Termination Agreements thus incorporated by reference Emhart's Stock Option Plans ("Plans") and Stock Option Agreements ("Agreements") pursuant to which Bradley and Lamb had been granted stock options.[2]
 
 The Stock Option Plans and Agreements
 
 6
 The Stock Option Plans and Agreements expressed Emhart's intention to provide selected key employees with additional incentives in the form of stock options. The Plans provided that they were to be administered by the Management Compensation and Stock Option Committee of the Company's Board of Directors. Under section 13 of the Plans the Committee was authorized to designate any options as "Incentive Stock Options" ("ISOs") entitled to preferential treatment under Sec. 422A(b)(6) of the Internal Revenue Code. Section 13 expressly provided that "the provisions of the Plan as they relate to ISOs shall be construed to effectuate such purpose."
 
 
 7
 Each employee who was granted options under the Plans signed an Emhart Corporation Option Agreement, agreeing to be bound by its terms. The Agreements provided that options were exercisable subject to all of the terms of the Plans, "including without limitation the power of the Committee (as defined in the Plan) to construe and interpret the Plan and to hereafter establish and amend rules and regulations for its administration." The employee/optionee also agreed to remain in the employ of Emhart for a period of not less than one year from the date of the Agreement.
 
 
 8
 Each Agreement further provided that portions of the options granted became exercisable at the end of each successive year of employment. Lamb and Bradley's options became exercisable as follows:
 
 
 9
 Percentage of Shares
After Covered by Agreement
One year from the
date of this agreement 25%
Two years from the
date of this agreement An additional 25%
Three years from the
date of this agreement An additional 25%
Four years from the
date of this agreement An additional 25%
 
 
 10
 Section 6 of the Plans, entitled "Terms and Conditions of Options," contained provisions outlining the terms under which options could be granted. Under section 6(g), "Agreement to Serve," each employee granted an option agreed to serve, in the employ of Emhart Corporation or its subsidiaries, for at least one year from the date of that grant. Section 6(e), "Termination of Employment," provided:
 
 
 11
 Upon termination of an option holder's employment, for any reason other than death or deliberate, willful, or gross misconduct, his option shall be exercisable only to the extent he would have been permitted to purchase shares under his option at the date of such termination, and such option shall expire unless exercised within the three (3) month period following the date of such termination....
 
 
 12
 Section 6(e) contained an ambiguity which became important in light of the facts of this case. It did not clearly set forth the rights of an option holder as to shares covered by portions of options which were not exercisable at the time of separation from employment, but which became exercisable within three months of separation. Lamb and Bradley understood section 6(e) to mean that they continued to hold all of the portions of their options, whether exercisable or not, for the three month period following their separation from Emhart (January 31, 1989--April 30, 1989). At trial, Emhart contended that section 6(e) was not intended to be read that way, and that it was the company's practice to cancel all portions of options not exercisable at the time of an employee's termination. The District Court, however, construed section 6(e) in accordance with the Plaintiffs' understanding.
 
 
 13
 Under section 10 of the Plans, Emhart's Board of Directors was authorized to terminate or amend the Plans at any time, subject to certain controls. In particular, the Board was not permitted to make any change to options previously granted without the consent of the respective holders thereof. Option holders were thus protected from any Board action that might be undertaken against their interest.
 
 The Change in Control Amendments
 
 14
 In mid-1988 the Board of Directors of Emhart together with senior executives, outside counsel and the Compensation Committee began to discuss amending the Plans to include a change in control provision. Emhart's officers favored an amendment because of changes in the tax laws and because they worried that Emhart was susceptible to takeover attempts. The purpose of the change in control provision was to encourage senior executives to remain at Emhart even under the threat of a hostile takeover, by insuring that employees who had outstanding options at the time of a takeover would be able to realize the full value of options they held, by having them accelerated. On December 22, 1988 the Board accordingly voted to amend the Plans, adding section 6(i), "Effect of a Change in Control," which made all outstanding options immediately exercisable in the event of a change in control of the company.[3] At the same time the Board also passed a directive to insure that Agreements evidencing outstanding options would be amended to correspond with the newly amended Plans.[4]
 
 
 15
 On February 24, 1989 a letter was sent to all option holders whose Agreements Emhart believed had been affected by the Amendments. The letter explained the effect of the Amendments on the Plans and Agreements and requested the consent of each option holder as required by section 10 of the Plans. Lamb and Bradley did not receive this letter, and thus never consented to amendment of their Agreements.
 
 The Merger
 
 16
 On March 19, 1989 Emhart entered into an Agreement and Plan of Merger with Black & Decker Corporation and B & D, Inc. Both the Merger Agreement and the Schedule 14D-9, filed with the SEC, stated that each Emhart stock option outstanding on the date of the merger would become fully exercisable on the date of the merger, whether or not it had previously been exercisable. On April 4, 1989 Richard F. Vitkus, Senior Vice-President of Emhart, addressed a memo to all Emhart stock option holders stating:
 
 
 17
 The merger agreement between Emhart and Black & Decker provides that immediately following Black & Decker's purchase of Emhart shares under the Tender Offer, all outstanding Emhart stock options, whether or not currently exercisable, will become fully exercisable and vested, and the option holders will be entitled to receive an amount of cash for each option share equal to the "spread" between the option exercise price and the Tender Offer price of $40 per share.... Because all options are being cashed out in this manner, it will not be necessary to exercise your options.
 
 
 18
 (Emphasis in original.) Bradley and Lamb each received this memo.
 
 
 19
 Black & Decker purchased the shares of common stock of Emhart Corporation pursuant to the tender offer and triggered the Change in Control Amendment on April 28, 1989. The facts as they relate to Lamb and Bradley at that time were:
 
 
 20
 1. They had signed Termination Agreements in early December 1988.
 
 
 21
 2. At that time each held stock options granted by virtue of their length of service.
 
 
 22
 3. The Termination Agreements incorporated the terms of the Stock Option Plans and provided that rights in the stock options outstanding after separation would be dictated by the Plans, including section 10 which allowed Emhart to amend the Plans and Agreements.
 
 
 23
 4. The Stock Option Plans were amended on December 22, 1988 to make stock options immediately exercisable in the event of a change in control.
 
 
 24
 5. Lamb and Bradley's separation as employees occurred on January 31, 1989.
 
 
 25
 6. At the time of separation they had options which did not expire until April 30, 1989.
 
 
 26
 7. The Change in Control Amendments were triggered on April 28, 1989.
 
 
 27
 On April 28, 1989 Robert Byrnes, Vice-President of Human Resources at Emhart, sent out a memo entitled "Cash Out of Stock Options" informing each option holder that:
 
 
 28
 In connection with the cashing out of your Emhart stock options, enclosed is a check for the net amount of the difference between $40 per share and the option exercise price for each unexercised share you held under option on April 27, 1989.
 
 
 29
 Attached to this memorandum was a summary of the option holder's Stock Option Agreements, showing the shares granted, the shares previously exercised, the gain previously realized, the number of shares Emhart considered granted but unexercised that were subject to the cash out, and a calculation of the gain realized as a result of the cash out of those unexercised shares. The memo closed by noting that "[t]he payment evidenced by the enclosed check satisfies all obligations of Emhart Corporation under all stock option agreements entered into between Emhart Corporation and the optionee whose name appears thereon." The cash out memorandum also informed the optionee whom they should call if they had any questions regarding their options or the enclosed check. Both Bradley and Lamb received cash out memoranda and checks.
 
 
 30
 The cash out memoranda and checks that Lamb and Bradley received reflected only those portions of their options which were exercisable at the time of their separation on January 31, 1989. Lamb and Bradley expected that under the Amendments they would receive payment for all of the shares covered by their options at the time of their termination, whether or not the options were fully exercisable at that time. Both men believed that the checks they received were the result of a mistake. They deposited the checks and individually contacted Emhart to clear up the mistake; they were informed that they were not entitled to payment for shares covered by portions of options not exercisable at the time of their separation.
 
 Proceedings Below
 
 31
 Plaintiffs filed this diversity action in the United States District Court for the District of Connecticut, seeking the cash out value of those shares covered by portions of options which were not exercisable at the time of their separation but which were, they contended, still outstanding under the Change in Control Amendments. At trial Emhart argued, first, that the Change in Control Amendments did not apply to the Plans and Agreements of Lamb and Bradley. Second, Emhart raised the affirmative defense that Lamb's and Bradley's acceptance and endorsement of the cash out checks was an accord and satisfaction and as such discharged any obligation Emhart may have had to them. Finally, Emhart counterclaimed, arguing that Plaintiffs' cause of action was in breach of the release provision in their Termination Agreements.
 
 
 32
 Following a three day bench trial the District Court found that the Change in Control Amendments did apply to Lamb and Bradley. Lamb v. Emhart Corp., No. H-90-15(AHN), 1990 WL 210402, slip op. (D.Conn. April 7, 1994). The District Court further held that Emhart failed to prove the essential elements of an accord and satisfaction and that Plaintiffs' claims were not in breach of the Termination Agreements.[5] The Court accordingly entered judgment in favor of the Plaintiffs and awarded them damages. Emhart now appeals that judgment and award.
 
 DISCUSSION
 Standard of Review
 
 33
 Emhart argues that because the District Court adopted the proposed findings set forth in Plaintiffs' post-trial brief the findings must be subjected to a stricter standard of review than the clearly erroneous standard usually used for appellate review of findings of fact. This is not true. In Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 572, 105 S.Ct. 1504, 1510-11, 84 L.Ed.2d 518 (1985) (citations omitted), the Supreme Court addressed this issue:
 
 
 34
 We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record.... Nonetheless, our previous discussions of the subject suggest that even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.
 
 
 35
 In this case, although the District Court did in large part adopt the Plaintiffs' proposed findings, as indicated in Anderson the Court's findings may be reversed only if clearly erroneous.The Change in Control Amendments
 
 
 36
 Emhart makes three arguments in support of its contention that Bradley and Lamb were not entitled to benefits under the Change in Control Amendments. First, Emhart asserts that the Amendments were not properly incorporated into Plaintiffs' Termination Agreements and thus did not apply to them. Second, Emhart argues that the Amendments, even if properly incorporated, constituted a material modification of the Stock Option Plans requiring additional consideration and that Plaintiffs did not provide such consideration in light of their termination from Emhart. Finally, Emhart claims that the portions of Plaintiffs' options that were not exercisable at the time of separation, were cancelled at that time and were not "outstanding" for purposes of the Amendments at the time of the merger.
 
 A. Incorporation
 
 37
 Emhart argues that the Stock Option Agreements as amended by the Change in Control Amendments were not incorporated by reference into Bradley's and Lamb's Termination Agreements. Emhart asserts that Plaintiffs' rights were set on the day they signed their Termination Agreements, and not on their separation date. Emhart further argues that the Termination Agreements do not meet the requirements of Connecticut law for the incorporation by reference of future amendments.
 
 The Termination Agreements provided that:
 
 38
 Any rights which you may have following your separation date under outstanding stock options granted to you will be determined in accordance with the terms of the respective stock option plans under which the options were granted and in accordance with the terms of the respective option agreements evidencing such stock options.
 
 
 39
 The District Court correctly concluded that this language "plainly directs the reader to look to their rights 'following their separation date.' " The Court therefore properly rejected Emhart's claim that Plaintiffs' rights were established on the date they signed the Termination Agreements.
 
 
 40
 The terms of the Termination Agreements were also sufficient to meet the requirements of Connecticut law for the incorporation by reference of documents not yet in existence. The Termination Agreements explicitly incorporated by reference the Emhart Stock Option Plans and Agreements through the above-quoted paragraph. Under Connecticut law, "[w]here ... the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties." Batter Bldg. Materials Co. v. Kirschner, 142 Conn. 1, 7, 110 A.2d 464, 468 (1954). Incorporation by reference produces a single agreement out of the incorporated documents and the contract itself. See Randolph Constr. Co. v. Kings East Corp., 165 Conn. 269, 275, 334 A.2d 464, 467 (1973).
 
 
 41
 In order to uphold the validity of terms incorporated by reference it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms. When a contract binds parties to terms that are to be decided in the future by one of the parties, the elements of knowledge and assent may be missing. Evidence of knowledge and assent may be found in the circumstances surrounding the agreement. Housing Auth. of City of Hartford v. McKenzie, 36 Conn.Supp. 515, 518-19, 412 A.2d 1143, 1145 (Conn.Super.Ct.1979).
 
 
 42
 In this case the parties to each set of agreements were the same. This is not a case where two parties incorporated an agreement that one party had made with a third person, or where the incorporated agreement is between persons who have no connection to the contract. Each party here had two opportunities to examine the terms of the Stock Option Agreements and Plans, first, when they were originally drafted and signed and second, when they were incorporated into the Termination Agreements. Each party to the Termination Agreements knew of and assented to all of the provisions of the incorporated Agreements and Plans, including the amendment provisions of section 10 of the Plans.
 
 
 43
 When incorporated terms are to be decided by one party in the future, or when one party has the power to alter or amend the terms of the agreement, there must be an ascertainable standard for the promulgation of the new terms that is set forth in the original agreement and that can "provide a substitute for a present knowledge of and assent to the subsequently adopted provisions." See Housing Auth. of City of Hartford, 36 Conn.Supp. at 518, 520, 412 A.2d at 1146. In this case section 10 of the Plans includes such a standard.[6] Section 10 provides a framework for amendment of the Plans and Agreements. Under section 10 of the Plans, Emhart, through its Board of Directors, is permitted to change the terms of the Plans and Agreements only so long as it does not affect previously issued options without the permission of the respective option holders,[7] and it abides by the other restrictions contained in section 10. The other restrictions include: that the number of shares reserved for issue under the Plan may not be increased except as provided in other sections of the Plan, that the option price may not be fixed at less than 100% of the fair market value on the date the option is granted, that the terms of the Plan and options granted under it may not be extended, and that section 10 may not be altered so as to negate these restrictions. We conclude that Emhart's agreements with Lamb and Bradley, consisting of the Termination Agreements, incorporating the Stock Option Agreements and Plans, contained ascertainable standards for their own subsequent amendment by Emhart. Therefore there is sufficient evidence that both parties had the necessary knowledge of, and assented to, the incorporation of potential amendments to the Plans and thus to the Termination Agreements to find, as the District Court did, that the incorporation was valid under Connecticut law.
 
 B. Consideration
 
 44
 Emhart argues that applying the Amendments to the Plaintiffs' Stock Option Plans would constitute a material change in those Plans and as such would require additional consideration. Emhart maintains that no additional consideration was exchanged.
 
 
 45
 Emhart is correct that material modifications of a contract require additional consideration. Additional consideration is required for modifications when the changes constitute a new agreement bargained for by the parties. The additional consideration is required as evidence that the parties have in fact bargained for and agreed upon what is essentially a new contract. See Thermoglaze, Inc. v. Morningside Gardens Co., 23 Conn.App. 741, 745, 583 A.2d 1331, 1333, cert. denied, 217 Conn. 811, 587 A.2d 153 (1991).
 
 
 46
 In this case, however, there was no new agreement, and thus no modification under this rule. Emhart employees who signed Stock Option Agreements promised to serve Emhart or its subsidiaries for a period of time in respect of the options they received, thus providing sufficient consideration for any options granted under the Agreements.[8] The Agreements expressly stated that the options were to be administered "in the manner provided in and subject to all of the terms and conditions of [the Plans], including without limitation the power of the Committee (as defined in the Plan) to construe and interpret the Plan and to hereafter establish and amend rules and regulations for its administration." Thus all of Emhart's employees who signed Stock Option Agreements agreed to serve for at least one year in consideration for the grant of options under a Plan which Emhart was authorized to amend. The service provided by Lamb and Bradley after the signing of their Stock Option Agreements thus provided adequate consideration.
 
 
 47
 The original contract (the Agreements) which the parties bargained for, agreed upon, and were bound by, was one which allowed the representatives of one party, the Emhart Board of Directors, to change the terms of the contract in accordance with ascertainable standards. The original agreements, in short, contemplated the Amendments. Thus the Amendments did not require either party to do, "something further than or different from, that which he [was] already bound to do," Thermoglaze, 23 Conn.App. at 745, 583 A.2d at 1333, and were not a material modification requiring additional consideration.
 
 
 48
 C. Treatment of Unvested Portions of Options
 
 
 49
 Emhart argues that those portions of Lamb's and Bradley's options which had not vested were not outstanding at the time of the merger and thus not subject to the Change in Control Amendments. In support of this contention Emhart claims, first, that Emhart's own practice of cancelling the unvested portions of terminated employees' options was proper and, second, that the District Court misinterpreted the Internal Revenue Code.
 
 
 50
 Emhart claims that any rights that Lamb and Bradley may have had with regard to unvested portions of options were cancelled on the date of their terminations. Emhart relies on the language of section 6(e) of the Plans, arguing that it demonstrates that a terminated employee would be able to exercise his option only to the extent that he had vested portions on the date of his termination. Emhart states that it was standard practice, both of Emhart and in the industry generally, to cancel all unvested portions of options on the date of termination.
 
 The District Court, however, disagreed:
 
 51
 Section 6(e) first recognizes the overall character of the option as the entire bundle of shares and then narrows it, distinguishing between exercisable and unexercisable shares in order to inform an optionee what he may purchase within the three months following his termination. The Section then reverts to the overall bundle of shares construction with regard to expiration.
 
 
 52
 Emhart's corporate counsel testified that he could understand such a reading of section 6(e), and both he and a Senior Vice President testified that the section did not specifically state that any unexercisable portions of options were to be cancelled upon termination. "[W]hen two or more meanings may fairly be given to language in a contract, the language is to be construed against the one who drew it." Sturman v. Socha, 191 Conn. 1, 9, 463 A.2d 527, 531 (1983). The District Court correctly interpreted this provision against the one who drew it, Emhart, and in favor of Lamb and Bradley. Accordingly, the unvested portions of Plaintiffs' options were outstanding at the time of their separation from Emhart.
 
 
 53
 The District Court further found that Sec. 422A of the Internal Revenue Code,[9] as incorporated into the Plans and Agreements, required that incentive stock options granted to Emhart employees were to be considered outstanding until they were exercised in full or the limitation periods set forth in the Plans had expired. Relying on this finding, the District Court held that Plaintiffs' entire stock options were outstanding at the time of the merger and should have been accelerated as all other outstanding options were.
 
 
 54
 Section 13 of the Plans authorized the Committee to grant stock options pursuant to Sec. 422A. Section 13 expressly provided that "all of the provisions of this Section 13 and the provisions of the Plan as they relate to ISOs [incentive stock options] shall be construed to effectuate such purpose." Section 422A required that options meet certain criteria to qualify for favorable tax treatment as incentive stock options. One of the requirements of Sec. 422A was that options could not be exercisable while any pre-existing ISOs were outstanding. See 26 U.S.C.A. Sec. 422A(b)(7). Section (c)(7) of Sec. 422A defined "outstanding":
 
 
 55
 For the purposes of subsection (b)(7), any incentive stock option shall be treated as outstanding until such option is exercised in full or expires by reason of lapse of time.
 
 
 56
 Complying with the requirements of Sec. 422A(b)(7), section 13(b) of the Emhart Stock Option Plans provided:
 
 
 57
 An ISO granted to an employee shall not be exercisable while there is outstanding (within the meaning of Section 422A(c)(7) of the Code) any incentive stock option (as defined by Section 422A of the Code) which was granted to such employee before the granting of such ISO to purchase stock in his employer corporation or stock in a corporation which (at the time of the granting of the ISO) is a parent or subsidiary corporation of the employee's employer corporation or in a predecessor corporation of any of such corporations.
 
 
 58
 Emhart argues that the definition of "outstanding" in Sec. 422A(c)(7) was intended only for the purpose of (b)(7). However, the language of section 6(e)[10] of the Plans, which deals with the expiration of terminated employees' options by lapse of time, must be read in conjunction with section 13 of the Plans, which incorporates Sec. 422A(c)(7) in order to define and construe the substantive rights of option holders under the Plans. All of these provisions read together indicate that terminated employees' entire options remain outstanding until three months after termination, when they expire by lapse of time.
 
 Accord and Satisfaction
 
 59
 Emhart contends that the evidence establishes that Plaintiffs' acceptance of their cash out checks constituted an accord and satisfaction. In order to prove an accord and satisfaction, the defendant must show that at the time of the agreement a good faith dispute existed over the existence of a debt or over an amount owed, and that the debtor and the creditor negotiated a contract of accord to settle the claim. Peerless Hosiery Co. v. Northern Ins. Co., 108 F.Supp. 52, 55-56 (D.Conn.), aff'd, 199 F.2d 957 (2d Cir.1952); County Fire Door Corp. v. C.F. Wooding Co., 202 Conn. 277, 281, 520 A.2d 1028, 1030 (1987). The accord must be a new agreement based on new consideration. Crucible Steel Co. of America v. Premier Mfg. Co., 94 Conn. 652, 656, 110 A. 52, 55 (1920). The proponent must be able to show that there was a meeting of the minds, and that the offer by the debtor was clearly tendered as full satisfaction of the debt, and the payment was knowingly accepted. Crucible Steel Co., 94 Conn. at 656, 110 A. at 55; County Fire Door, 202 Conn. at 281, 520 A.2d at 1030; Gillis v. Gillis, 21 Conn.App. 549, 552, 575 A.2d 230, 231-32, cert. denied, 215 Conn. 815, 576 A.2d 544 (1990).
 
 
 60
 Judge Nevas correctly found on the evidence that there was no accord and satisfaction between Emhart and Lamb or Bradley. There was no evidence at trial that the cash out checks were intended as a new contract between the company and Lamb or Bradley. There was also no evidence that a dispute existed between the two parties at the time the checks were cashed. Several witnesses from Emhart testified that the company was in fact surprised when Lamb and Bradley disputed the amount of their checks. Lamb and Bradley both testified that at the time they received their checks they believed that the checks did not fully satisfy the company's debt to them, but they assumed the matter could be resolved. Both Lamb and Bradley testified that they had no knowledge that cashing the check would extinguish their rights.
 
 
 61
 Emhart relies heavily on County Fire Door Corp. In that case the Connecticut Supreme Court held that even expressly reserving the right to protest on the face of the check would not defeat an accord and satisfaction if the other elements were met. 202 Conn. at 290, 520 A.2d at 1035. However, in that case the dispute between the parties as to amount owed had existed for some time, the check expressly stated that it was in full satisfaction of the debt, and the creditor knew that it might lose its right to protest by cashing the check as was evidenced by its attempt to reserve those rights. Here, in contrast, the evidence shows that no dispute existed at the time the checks were cashed, there was no meeting of the minds, and Lamb and Bradley did not knowingly accept their checks as full satisfaction of the debt Emhart owed to them. Accordingly, we agree with the District Court that Emhart failed to meet its burden to prove the elements of the affirmative defense of accord and satisfaction.
 
 CONCLUSION
 
 62
 In sum, we are not persuaded by Emhart's attack on the District Court's decision. The judgment of the District Court is affirmed.
 
 
 
 [1]
 The complaint in this case was originally filed as a class action with four named complainants. Plaintiffs later amended their complaint to drop two of the named plaintiffs and the class allegations were dismissed by the court, leaving only Lamb and Bradley as Plaintiffs in the amended complaint
 
 
 [2]
 There are two Stock Option Plans in question in this case, the 1983 Stock Option Plan of Emhart Corporation, and the 1986 Stock Option Plan of Emhart Corporation. The two Plans are essentially the same and any differences between the two are not pertinent to this appeal
 
 
 [3]
 The Change of Control Amendments read, in pertinent part:
 (i) Effect of a Change in Control. Notwithstanding subparagraphs (b) or (e) above, in the event of a Change in Control, as hereinafter defined, all options outstanding on the date of such Change in Control shall become immediately and fully exercisable.
 The Board amended this provision to both the 1983 and the 1986 Stock Option Plans.
 
 
 [4]
 That directive read:
 RESOLVED: That the Management Compensation and Stock Option Committee shall amend the stock option agreements evidencing options outstanding under the 1986 Stock Option Plan on the date such Amendment is adopted to reflect the terms of such Amendment.
 The same directive was issued with regard to the 1983 Stock option Plan.
 
 
 [5]
 The Termination Agreements which Lamb and Bradley signed contained provisions releasing Emhart from any claims they may have had except for those claims regarding Emhart's obligations under the Termination Agreements. The District Court held that because the Stock Option Plans and Agreements were incorporated by reference into the Termination Agreements, Plaintiffs' claims were regarding Emhart's obligation under those agreements and thus were not discharged. This issue is not raised on appeal
 
 
 [6]
 Emhart argues that even if section 10 of the Plans does contain an ascertainable standard, the Plans are not the principal agreement. The requirement that the standards be contained in the primary agreement is simply to insure that they are part of the parties' original agreement, not a part of the future incorporations, and that both parties are aware of the terms which they are agreeing upon. See Housing Auth. of City of Hartford, 36 Conn.Supp. at 520, 412 A.2d at 1146. In this case we have essentially two separate incorporations; the first is the incorporation of the Plans and Agreements into the Termination Agreements and the second is the incorporation of any future amendments to the Plans and Agreements. The first incorporation creates the primary agreement, which does contain the standards to guide any incorporation of future amendments
 
 
 [7]
 We agree with the District Court that Emhart can not be heard to complain that Lamb and Bradley are not entitled to benefits under the Amendments because they did not consent to them. Emhart effectively prevented Lamb and Bradley from consenting to the Amendments by declining to send them a consent letter and thus lost its right to raise this defense. See Burns v. Gould, 172 Conn. 210, 220, 374 A.2d 193, 200 (1977)
 
 
 [8]
 The issuance of stock options constitutes a contract between the employer and employee, supported by the consideration of the employee's subsequent continued employment. See Ellis v. Emhart Manufacturing Co., 150 Conn. 501, 508, 191 A.2d 546, 550 (1963). The circumstances surrounding the contract must reasonably assure that the employer will receive the contemplated benefit (the employee's continued service) from the grant of the options. Id
 
 
 [9]
 The District Court considered Sec. 422A as it existed at the time the Plans and Agreements were drafted in 1983 and 1986. In 1988 Sec. 422A was amended; at that time the provisions in question in this case were removed from the statute. In 1990 the law was amended again and was redesignated as Sec. 422. See 26 U.S.C.A. Sec. 422 (1988 & Supp.1994)
 
 
 [10]
 Section 6(e) of the Plans provides in pertinent part:
 (e) Termination of Employment Other Than By Misconduct of Death. Upon termination of an option holder's employment, for any reason other than death or deliberate, willful or gross misconduct, his option shall be exercisable only to the extent he would have been permitted to purchase shares under his option at the date of such termination, and such option shall expire unless exercised within the "Applicable Exercise Period" as hereinafter defined.... The "Applicable Exercise Period" shall be the three (3) month period following the date of the option holder's termination of employment....