**ORANGE IMPROVEMENTS PARTNERSHIP,**
**Plaintiff,**

v.

**CARDO, INC., Defendant.**

**No. 3:97 CV 661(GLG).**

United States District Court,
D. Connecticut.

Nov. 6, 1997.

---

John K. Atticks, III, Marlowe, Snow & Atticks, Madison, CT, for Plaintiff.

John J.L. Chobor, Greenberg, Hurwitz, Cooper & Silverman P.C., New Haven, CT, for Defendant.

## OPINION

GOETTEL, District Judge.

Pursuant to Federal Rule of Civil Procedure 56, plaintiff Orange Improvements Partnership moves for summary judgment on the issue of the liability of defendant, Cardo, Inc. For the reasons discussed below, plaintiff's motion (Document # 12) is DENIED.

## BACKGROUND

Plaintiff, Orange Improvements Partnership ("Orange Improvements"), owns a shopping center in Orange, Connecticut known as the Orange Promenade Center (the "Center"). Orange Improvements leases a portion of the premises to defendant, Cardo, Inc. ("Cardo"), in which Cardo has operated a package and liquor store for over thirty years. Cardo originally entered into a lease agreement in 1965 (the "1965 Lease") for its package and liquor store with Orange Improvements' predecessor, Whiteacre–Orange Associates ("Whiteacre–Orange"). Since the 1965 Lease, the Center's ownership has changed hands twice until Orange Improvements assumed ownership on April 30, 1993. When Orange Improvements became the Center's owner, it obtained all of its predecessors' rights, duties, and obligations to the original lease agreements with all the Center's lessees. Orange Improvements currently employs DLC Management Corp. (the "Management Company") to manage the Center.

Under the terms of the 1965 Lease, Cardo paid a minimum annual rent of $7,584.00. Additionally, Cardo was required to pay an additional percentage rental based upon its gross sales in excess of $250,000.00. The relevant portion of Article IV of the 1965 Lease provides:

> Tenant agrees to pay to Landlord ... rent at the following rates and times:....

> (b) Additional percentage rental as follows:

> An amount equal to 5 per centum of the total of all gross sales made by the Tenant in, on or from the demised premises during the lease year next preceding in excess of $250,000.00.

The term "gross sales" is defined as:

> all receipts from sales made or services rendered in, on or from the demised premises, whether for cash or on credit, and all compensation received for orders taken on the demised premises. less all discounts and allowances to customers, and refunds and credits to customers for merchandise returned or exchanged, and less the amounts of any sales, luxury or excise taxes, so-called, collected by Tenant....

As of 1965, Cardo's gross sales included receipts from liquor, beer, and soda sales.

On February 25, 1967, Whiteacre–Orange wrote to Cardo in order to modify the 1965 Lease (the "1967 Letter") with respect to the

provision on additional percentage rent. The relevant portion of the 1967 Letter provides:

> It is true that I had promised you that Stop and Shop would carry no liquor or beer in the shopping center. However, their lease was signed before yours.
>
> In consideration of the fact that they are carrying beer, we will exclude beer and soda from overage percentage rent.

According to this letter, Whiteacre–Orange and Cardo calculated the amount of additional percentage rent based on Cardo's receipts from its liquor sales only, and excluded receipts from its beer and soda sales. On April 21, 1976, the 1967 Letter was recorded with the 1965 Lease in the Orange Land Records in volume 255 at page 533 and volume 255 at page 506, respectively.

The consideration stated for the exclusion of beer and soda sales was the existing competition from Stop and Shop. Stop and Shop subsequently vacated the Center in 1989. Orange Improvements asserts that since Stop and Shop left, no other tenant competes with Cardo by selling beer and soda for off-premises consumption in the regular course of business.

In 1990, Cardo negotiated a modification of the 1965 Lease ("1990 Lease Modification") with one of Orange Improvements' predecessors, Orange White Acres, Inc. ("Orange White Acres"). As part of Orange White Acres' plan to improve the Center, Cardo's leased premises were renovated, improved, and enlarged. The 1990 Lease Modification therefore modified provisions of the 1965 Lease relating to the definition of the demised premises, the amount of annual minimum rent, and the amount of insurance that Cardo was required to carry.

During the construction period, the parties agreed, inter alia, to modify the rent provision due to the need to temporarily relocate Cardo's package store. The rent provision stated that " 'additional percentage rental' as set forth in Article IV(b) [of the 1965 Lease] shall continue to be due and payable in accordance with said Lease." The 1990 Lease Modification defines the term "lease" as a certain lease agreement entered into on May 14, 1965 between Cardo and Whiteacre–Orange.

Upon termination of the construction period, the parties agreed to modify and amend the 1965 Lease, inter alia, in order to increase the amount of the minimum annual rent. According to the modified provision, Cardo agreed to pay a minimum annual rent of $13,704.00. Finally, the penultimate paragraph of the 1990 Lease Modification provides that "[a]ll of the terms and conditions of the [1965] Lease ... not ... modified and amended above shall remain in full force and effect as if restated herein in all of its parts...." The 1990 Lease Modification does not make any reference to the 1967 Letter. Moreover, the definition of the term "lease," as the 1965 Lease, makes no reference to the modification in the 1967 Letter.

After Orange Improvements became the Center's owner in 1993, Cardo continued paying rent according to the terms of the 1965 Lease as modified by the 1967 Letter. While Orange White Acres was lessor from 1990–93, it never requested additional percentage rent based on Cardo's beer and soda sales. Instead, Orange White Acres accepted the override based only on Cardo's liquor sales. According to Orange Improvements, Cardo has accounted to it for all of Cardo's gross sales, including beer and soda sales, since 1993. Each month, Cardo would pay its minimum monthly rent and annually, it would separately pay an amount for the additional percentage rent.

Orange Improvements asserts that it conducted a review of the Center's lease documents in the winter of 1996–97 at which time it determined that Cardo had not paid additional percentage rent on its beer and soda sales. On February 11, 1997, Orange Improvements made a demand upon Cardo to pay additional percentage rent based on the sale of liquor, beer, and soda. Accordingly, it presented a bill to Cardo in the amount of $87,236.00 for past due additional percentage rent based on Cardo's receipts from beer and soda sales for the period from April 1993 through December 1996.

In a supplemental agreement dated October 13, 1966, the term of the 1965 Lease was set for a twenty year period to expire on October 31, 1986. On February 19, 1986,

Hyman Gluck, Cardo's then-president, exercised Cardo's option to extend the 1965 Lease for a further term of five years with a termination date of October 31, 1991. In a letter dated May 25, 1991, Gluck again exercised Cardo's option to extend the termination date for a five year period until February 27, 1997. Cardo's current president, Robert Wardle, wrote to the Management Company on July 23, 1996 in order to exercise Cardo's option to extend the lease for another five year period to expire on February 27, 2002. In the 1991 and 1996 extension letters, Cardo's presidents refer to the lease dated May 14, 1965 and the supplemental agreements dated October 13, 1966 and September 6, 1990. They do not mention the 1967 Letter as having modified the 1965 Lease.

Orange Improvements commenced this action on April 8, 1997, as amended on April 24, 1997, after Cardo did not pay the $87,236.00 bill for additional percentage rent based on its beer and soda sales. In its amended complaint, Orange Improvements seeks money damages, an accounting, reasonable attorney's fees in accordance with the lease, and other such relief as to which law or equity may pertain. In particular, Orange Improvements claims that Cardo is "indebted to [it] for an amount equal to five percent of [Cardo's] sales of beer and liquor [sic, soda?] from April 30, 1993 to and including the lease year last ending." Orange Improvements then made this motion for summary judgment on August 25, 1997 on the issue of Cardo's liability.

## DISCUSSION

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). When ruling on a summary judgment motion, a court must construe the facts in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Orange Improvement bears the burden of demonstrating the absence of a genuine issue of material fact.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If there is no genuine issue of material fact, the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In an action involving contract interpretation, summary judgment is appropriate only when the terms of the agreement are wholly unambiguous, *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975), considering the surrounding circumstances and undisputed evidence of intent. *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir.1995). Contractual language is unambiguous if it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd., v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (alteration in original) (quoting *Breed v. Insurance Company of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978)).

Language does not become ambiguous solely because the parties offer conflicting interpretations during the course of litigation. *See Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) (stating that "[c]ontorted semanticism must not be permitted to create an issue where none exists."). Instead, the moving party must prove that the contractual language is not susceptible to at least two fairly reasonable meanings. *Id.; see Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990) (finding that both language and inferences to be drawn from it must not be reasonably susceptible to more than one meaning). If the moving party cannot establish unambiguous contract language, "a material issue exists concerning the parties' intent, and the non-moving party has a right to present extrinsic evidence regarding the meaning of the contested term." *Wards*, 761 F.2d at 120; *see Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983) (stating that where contractual language may be susceptible to at least two fairly reasonable mean-

ings, summary judgment is improper if the evidence presented is conflicting). If the contractual language is ambiguous and subject to varying reasonable interpretations, the issue of the parties' intent is a question of fact, thereby rendering summary judgment inappropriate. *Thompson v. Gjivoje,* 896 F.2d 716, 721 (2d Cir.1990).

■ Generally, contract interpretation involves issues of the parties' intent and thus presents a question of fact. *Bead Chain Mfg. Co. v. Saxton Prods., Inc.,* 183 Conn. 266, 274–75, 439 A.2d 314, 319 (1981). If, however, there is definitive contract language, "the determination of what the parties intended by their contractual commitments is a question of law." *Thompson & Peck, Inc. v. Harbor Marine Contracting Corp.,* 203 Conn. 123, 131, 523 A.2d 1266, 1270 (1987); *see Mycak v. Honeywell, Inc.,* 953 F.2d 798, 802 (2d Cir.1992) (affirming district court's grant of summary judgment in favor of an employer in a breach of contract case because the trial court had found the contract language unambiguous, thereby permitting it to consider the parties' conduct as it pertained to their contractual duties); *Rothenberg v. Lincoln Farm Camp. Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985) (finding that a question of law is presented if contract language is unambiguous and reasonable people could not differ as to its meaning); *Mulligan v. Rioux,* 229 Conn. 716, 740–41, 643 A.2d 1226, 1239 (1994) (construing the termination provision of a contract as a question of law, according to the parties' intent, because the contract contained definitive language).

■ When examining the parties' intent, the court must look to the intent expressed in the contractual language and not to any intention that may have existed in the parties' minds. *Gateway Co. v. DiNoia,* 232 Conn. 223, 231–32, 654 A.2d 342, 347 (1995); *see Water and Way Properties v. Colt's Mfg. Co.,* 230 Conn. 660, 666, 646 A.2d 143, 145–46 (1994) (upholding the trial court's grant of summary judgment in favor of the landlord on the issue of the tenant's liability because the unambiguous contract language did not support the tenant's strained construction as to what the parties may have intended as to the tenant's rent obligations). The parties'

intention can be determined by examining the language used, interpreted in light of the parties' situation and circumstances surrounding the transaction. *Ives v. City of Willimantic,* 121 Conn. 408, 411, 185 A. 427 (1936).

### 1. *Actual and Constructive Notice*

As a federal court sitting in diversity jurisdiction, this Court applies state substantive law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Accordingly, this Court will apply Connecticut state law on contracts and leases to resolve the present dispute.

■ Orange Improvements contends that when it purchased the Center in 1993 it had no actual or constructive notice of the 1967 Letter. In order for Orange Improvements to avoid the contractual rights and obligations of the 1967 Letter, Orange Improvements must have been a bona fide purchaser without notice of the written modification (the 1967 Letter) of Cardo's 1965 Lease with Whiteacre–Orange. Conn. Gen.Stat. Ann. §§ 47–10, 47–19; *see Clean Corp. v. Foston,* 33 Conn.App. 197, 201, 634 A.2d 1200, 1202 (1993) (holding that a lease conveying an "interest in land for more than one year is not effectual against a bona fide purchaser of the leased land unless the lease is recorded on the land records or the purchaser has actual notice of the lease prior to purchase."). It is undisputed that prior to February 1997, Orange Improvements had no actual notice of the 1967 Letter. The issue is whether the Orange Land Records gave Orange Improvements constructive notice of the 1967 Letter.

■ Under Connecticut law, "[n]o lease of any building ... for any term exceeding one year ... shall be effectual against any persons other than the lessor and lessee and their respective successors ... unless it is in writing, executed, attested, acknowledged and recorded in the same manner as a deed of land ...." Conn. Gen.Stat. Ann. § 47–19. The purpose of Connecticut's recording act is to invalidate leases as against third parties, but not as against the parties themselves. *Johnson v. Phoenix Mut. Life Ins. Co.,* 46 Conn. 92, 97 (1878). As used in the record-

ing act, the term successor refers to parties who take property by will or inheritance and not generally to successors-in-interest. *Drazen Properties Ltd. Partnership v. E.F. Mahon, Inc.,* 19 Conn.App. 471, 475, 562 A.2d 1142, 1144 (1989).

In February 1997, after receiving Orange Improvements' demand for overdue payment of additional percentage rent based on its beer and soda sales, Cardo forwarded a copy of the 1967 Letter to an officer of the Management Company. Orange Improvements' receipt of the 1967 Letter placed it on actual notice that the rent provision in the 1965 Lease had been modified to exclude beer and soda sales from the calculation of additional percentage rent. *See Guffey v. Smith,* 237 U.S. 101, 110, 119, 35 S.Ct. 526, 528, 531–32, 59 L.Ed. 856 (1915) (finding that, in case involving multiple leases for same tract from common lessor, subsequent lessees were on actual notice of prior lessees' existence when successors-in-interest of prior lessees contacted subsequent lessors to inform them of their prior leases).

As Whiteacre–Orange's successor-in-interest, Orange Improvements has constructive notice only of that which is revealed by a search of its predecessor's chain of title. *See Genovese Drug Stores, Inc. v. Connecticut Packing Co.,* 732 F.2d 286, 290 (2d Cir.1984) (stating the traditional rule that a purchaser of property is charged with constructive notice "only of those encumbrances that appear in his direct chain of title"). The 1967 Letter had been recorded in the Orange Land Records in volume 255 at page 533, directly following the 1965 Lease which was recorded in the same volume at page 506. Thus, the recordation of the 1967 Letter placed Orange Improvements on constructive notice that the additional rent provision in the 1965 Lease had been modified because a search of Whiteacre-Orange's chain of title would reveal the existence of the 1967 Letter.

Consequently, Orange Improvements cannot seek protection of Connecticut's recording statute first, because as a successor-in-interest it is not considered the type of third party entitled to protection, and second, because the recording of the 1967 Letter placed it on constructive notice. The lease between

Cardo and Whiteacre–Orange "was perfected as to the parties thereto, and firmly established the contractual rights and obligations of both parties." *Farmers and Mechanics Sav. Bank v. First Fed. Sav. and Loan Ass'n,* 167 Conn. 294, 302, 355 A.2d 260, 264 (1974). Thus, unless the 1990 Lease Modification modified the parties' rights and obligations, Orange Improvements is bound to comply with the contractual language which provides that it is entitled to an additional percentage rent based only on Cardo's liquor sales.

### 2. Effect of the 1990 Lease Modification on the 1967 Letter

■ Orange Improvements argues that there is no genuine issue of material fact because the plain language of the 1990 Lease Modification refers only to the 1965 Lease, and not to the 1965 Lease as modified by the 1967 Letter. Orange Improvements also contends that, even if the 1967 Letter modified the 1965 Lease at one time, the 1967 Letter no longer has any contractual effect because its underlying rationale ceased to apply once Stop and Shop vacated the Center in 1989. Accordingly, Orange Improvements urges this Court to find that the 1990 Lease Modification had rendered the 1967 Letter ineffectual as a matter of law.

### a. Modification of the 1965 Lease

■ It is undisputed that the 1967 Letter was a valid modification of the 1965 Lease because "[p]arties to an existing contract may, by a subsequent contract, alter any term of their original one." *Gordon v. Indusco Management Corp.,* 164 Conn. 262, 267, 320 A.2d 811, 816 (1973) (citations and internal quotation marks omitted). In *Agreda v. Lopez,* Civ. No. 960382147, 1997 WL 35821 (Conn.Super.Jan.21, 1997), the court granted relief according to the terms of a second agreement instead of the first agreement because it found that a "contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." *Id.* at *1.

■ To constitute a valid modification, the agreement must be supported by sufficient consideration which can take the form of mutual promises. *Three S. Dev. Co. v. Santore*, 193 Conn. 174, 178, 474 A.2d 795, 798 (1984); *see Lamb v. Emhart Corp.*, 47 F.3d 551, 559 (2d Cir.1995) (construing Connecticut contract law as requiring consideration for any material modification of a contract). Here, Cardo and Whiteacre–Orange exchanged mutual promises in the 1967 Letter by which Cardo promised to pay and Whiteacre–Orange promised to accept additional percentage rent based on the exclusion of beer and soda sales. Additionally, the 1967 Letter does not provide that the exclusion of beer and soda sales would be effective only so long as Stop and Shop remained a tenant in the Center or other competition existed which infringed on Cardo's beer and soda sales.

Finally, a valid modification remains effective until the agreement terminates by its terms, or until the parties agree to rescind the contract. *See Jones v. Management and Computer Servs., Inc.*, 976 F.2d 857, 860 (3d Cir.1992) (providing that "[i]t is a deeply imbedded general principle of contract law that the validity of a contract is to be determined as of the time it is made."). Accordingly, the 1967 Letter continued to govern the payment of additional percentage rent even if the reason for granting the exclusion—the competition by Stop and Shop—no longer existed. Indeed, the 1967 Letter does not provide that the existence of competition was a condition precedent to the exclusion of beer and soda from the calculation of the additional percentage rent. Nor does the 1967 Letter contain a provision on the termination of the exclusionary clause.

The only issue is whether the parties, when they entered into the 1990 Lease Modification and referred to the 1965 Lease for its terms, meant the original 1965 Lease or the 1965 Lease as modified by the 1967 Letter.

### b. *Incorporation By Reference*

Orange Improvements urges this Court to consider only the 1965 Lease and the 1990 Lease Modification because it asserts that these writings constitute the entire contractual agreement between the parties. It further argues that the 1990 Lease Modification restated the terms of the 1965 Lease, to the exclusion of the 1967 Letter. By not mentioning the 1967 Letter in the 1990 Lease Modification, orange Improvements contends that the parties had *de jure* excluded it.

■ Under Connecticut law, "[w]here ... the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties." *Batter Bldg. Materials Co. v. Kirschner*, 142 Conn. 1, 7, 110 A.2d 464, 468 (1954); *see Randolph Constr. Co. v. Kings East Corp.*, 165 Conn. 269, 275, 334 A.2d 464, 467 (1973) (providing that when parties incorporate existing documents by reference they produce a single contract which includes the terms of the incorporated documents); *Housing Auth. of Hartford v. McKenzie*, 36 Conn.Supp. 515, 518, 412 A.2d 1143, 1145 (1979) (stating that if the terms and conditions of one document are incorporated into another document by reference, the two writings will be interpreted together as the agreement of the parties). A corollary to the principle of incorporation is that if there are multiple writings regarding the same transaction, the writings should be considered together to determine the parties' intent. *See Mongillo v. Commissioner of Transp.*, 214 Conn. 225, 229–30, 571 A.2d 112, 115 (1990) (considering stipulated judgment and deed to resolve ambiguity in parties' agreement).

It is undisputed that by restating the terms of the 1965 Lease in paragraph 12 of the 1990 Lease Modification, the parties expressed their intent that the rental agreement would encompass at least the 1965 Lease and the 1990 Lease Modification. Cardo contends that it and the then-lessor, Orange White Acres, also intended to and did incorporate the 1967 Letter by reference into the 1990 Lease Modification. To support this claim, Cardo points to the parties' conduct following the effective date of the 1990 Lease Modification by which Cardo continued to pay and Orange White Acres contin-

ued to accept additional percentage rent on Cardo's liquor sales only. While the 1990 Lease Modification uses clear language to define the lease between the parties as the 1965 Lease, it is unclear whether the parties intended this to mean the 1965 Lease as originally executed or the 1965 Lease as modified by the 1967 Letter.

There are three possible reasons why the parties to the 1990 Lease Modification did not refer to the 1967 Letter: (1) accidental omission on the drafters' part because they did not remember or have direct knowledge of the 1967 Letter; (2) all parties knew of the 1967 Letter and did not raise it as an issue because they assumed it would continue to be effective due to the parties' twenty-three year history of excluding beer and soda; or (3) Cardo assumed the 1967 Letter would remain effective as part of the 1990 Lease Modification and Orange White Acres assumed the 1990 Lease Modification would exclude the 1967 Letter.

 Orange Improvements, as assignee of the Center's leases, stands in the shoes of its predecessor-assignors, and has no greater rights to collect additional percentage rent based on Cardo's beer and soda sales than its predecessors would have had to those amounts. *See Fairfield Credit Corp. v. Donnelly*, 158 Conn. 543, 552, 264 A.2d 547, 551 (1969) (finding that the plaintiff, as assignee, could not prevail on its breach of instalment contract claim because its assignor would have been unable to recover under the instalment contract). It is possible that the reason Orange White Acres, through its president Doug Benach, never requested additional percentage rent based on Cardo's beer and soda sales was because it knew that the 1967 Letter modified the 1965 Lease. If Benach knew of the beer and soda exclusion, Orange White Acres would not have been able to assert a claim under the lease agreement. Additionally, if Orange White Acres did not intend that Cardo would pay additional percentage rent on its beer and soda sales, it would create an equitable right in Cardo, as the tenant.

 This Court finds that Orange White Acre's conduct from 1990–93 demonstrates an ambiguity as to the meaning of the term lease as defined in the 1990 Lease Modification. Due to Orange Improvements' failure to sustain its burden of showing that the 1990 Lease Modification is susceptible to only one fairly reasonable interpretation, Cardo is entitled to present extrinsic evidence on the parties' intent as of 1990. *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985). Thus, a trier of fact will have to consider the 1967 Letter's role in the negotiations of the 1990 Lease Modification. See *Schubert v. Ivey*, 158 Conn. 583, 587, 264 A.2d 562, 564 (1969) (stating that, where an agreement is evidenced by multiple writings, all writings must be considered to ascertain the expressed intent of the contract as a whole); *Cooper v. Malavese*, 1 Conn.Cir.Ct. 484, 486, 24 Conn.Supp. 168, 188 A.2d 266, 267–68 (finding that the contract between the parties consisted of an exclusive agency agreement and an exclusive sales agreement because the separate agreements related to the same transaction, thus requiring the court to read all writings together and to construe each document with reference to the other), *cert. denied*, 150 Conn. 717, 197 A.2d 928 (1962). The trier of fact will also have to examine Orange White Acre's intent as to whether the 1967 Letter's exclusion would continue to govern the parties' lease agreement.

#### c. *Rescission of the 1967 Letter*

One strong reason for finding in favor of Cardo, the nonmoving party, is that it is possible to find that the 1990 Lease Modification did not constitute an agreement to rescind the 1967 Letter. Orange Improvements argues that the 1967 Letter had no legal effect after Stop and Shop vacated the Center in 1989. It further contends that the 1990 Lease Modification canceled the operative effect of the 1967 Letter because the 1990 Lease Modification restated the unamended terms of the 1965 Lease without reference to the 1967 Letter.

 To escape contractual duties arising from an agreement that was expressly entered into, however, the parties must affirmatively act to disclaim any provisions that they no longer wish to be part of their agree-

ment. Parties to a contract may agree to rescind or abandon their contractual duties. *Yale Co-op. Corp. v. Rogin,* 133 Conn. 563, 568, 53 A.2d 383, 385 (1947); *see Rowe v. Cormier,* 189 Conn. 371, 373–74, 456 A.2d 277, 278 (1983) (finding ample evidence of abandonment where the testimony established that the parties agreed to "forget about" their agreement and where neither party had attempted to perform or compel performance of the agreement).

A valid agreement of rescission must be supported by sufficient consideration, similar to that required for an effective modification. *See Smith and Smith Bldg. Corp. v. DeLuca,* 36 Conn.App. 839, 844, 654 A.2d 368, 370 (1995) (comparing requirements for a valid modification with those needed for a valid agreement of rescission). Accordingly, an agreement of rescission is effective if it is based on an exchange of mutual promises. *See Savage Arms Corp. v. United States,* 266 U.S. 217, 220, 45 S.Ct. 30, 31, 69 L.Ed. 253 (1924) (holding that parties to a contract may release themselves of their contractual obligations by mutual agreement and stating that the "release of one is sufficient consideration for the release of the other"); *Smith and Smith,* 36 Conn.App. at 844, 654 A.2d at 370 (canvassing state appellate and supreme court cases to determine that "a rescission or nullification of a contract may be effected solely on the basis of an exchange of mutual promises by the parties without other forms of consideration.").

The determination of whether the parties intended to rescind or abandon the contract or terms of the contract may be inferred from the parties' conduct and attendant circumstances, *Yale Co-op.,* 133 Conn. at 568, 53 A.2d at 385–86, because the agreement of rescission does not need to be express. *See, Osborn v. Stevens,* 132 Conn. 410, 414, 45 A.2d 160, 162 (1945) (finding evidence of mutual assent to terminate an agreement for the sale of real estate despite the lack of an express agreement of rescission, where would-be buyer indicated that he could not raise the money for the purchase price, record title remained in would-be seller's name, and parties' relationship could

reasonably be construed as one of landlord-tenant).

Additionally, it is ordinarily a question of fact whether the parties manifested an intent to rescind or cancel their agreement. *Rowe,* 189 Conn. at 373, 456 A.2d at 278; *see First Hartford Realty Corp. v. Ellis,* 181 Conn. 25, 33, 434 A.2d 314, 318 (1980) (finding, in dicta, that the meaning to be given to an oral agreement to cancel a debt "depends upon the intention of the parties, which is a question of fact"). It could be argued that, here, however, no issue of fact is involved merely because plaintiff's attorney has proposed one way of interpreting the language in the 1990 Lease Modification without any factual evidence to support this construction. *See Mycak v. Honeywell, Inc.,* 953 F.2d 798, 802 (2d Cir.1992) (stating that the mere assertion of an ambiguity does not preclude summary judgment and granting summary judgment in breach of contract case where record was "barren" of evidence showing the contract at issue was unclear). Orange Improvements has not offered any evidence to support its allegation that the parties intended to agree to rescind the 1967 Letter, other than referring to the contractual language. Nor does Orange Improvements claim that the parties orally agreed to rescind the 1967 Letter. Instead, Orange Improvements contends that the failure to refer to the 1967 Letter as modifying the 1965 Lease in the 1990 Lease Modification implies that the parties intended to be bound by the additional percentage rent provision in the 1965 Lease, such that the calculation would be based on Cardo's sales of liquor, beer, and soda. Thus, Orange Improvements argues that the 1967 Letter was *de jure* excluded from the parties' lease agreement.

To the contrary, it is possible to find that the 1990 Lease Modification, to the extent that it concerns the additional percentage rent provision but does not refer to the 1965 Lease as modified by the 1967 Letter, adopts the entire 1965 Lease as modified by the 1967 Letter. We further note that Cardo never expressly agreed to rescind the 1967 Letter. Parties usually cannot merely ignore their contractual obligations through an

omission where, as here, in the 1990 Lease Modification the parties failed to refer to the 1965 Lease as having been modified by the 1967 Letter. As successor-in-interest to the original lessor, Orange Improvements was required to establish the full extent of the agreements with its lessees, including Cardo.

The parties' conduct supports the finding that the 1990 Lease Modification did not include an agreement to rescind the 1967 Letter. *See Yale Co-op.*, 133 Conn. at 568–69, 53 A.2d at 386 (finding that the parties effectively terminated their agreement, where the defendant orally informed the plaintiff that he could not perform under the contract, the parties did not communicate with each other after this conversation, and the parties' subsequent activities showed they understood that their original agreement had terminated). After the effective date of the 1990 Lease Modification, the parties to that agreement continued to act in conformity with the terms of the 1967 Letter. Cardo paid additional percentage rent based on its liquor sales, excluding its sales of beer and soda. Orange Improvements' predecessor accepted this form of payment for the duration of its ownership of the Center. Moreover, Orange Improvements also accepted rent from Cardo in this manner from its assumption of ownership in 1993 until it conducted a review of the leases in 1997. These issues, however, will be left for the trier of fact to decide because this Court finds that whether the parties intended to agree to rescind the 1967 Letter is a question of fact.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is DENIED.

**SO ORDERED.**